HOUGH (MANCHESTER v.). See Case No. 9,005.

HOUGH (MOORE v.). See Case No. 9,766.

## Case No. 6,722.
### HOUGH v. RICHARDSON et al.
[3 Story, 659.] 1

Circuit Court, D. Maine. May Term, 1845.

FALSE REPRESENTATIONS — RESCISSION OF CONTRACT—EQUITY PLEADING—PRINCIPAL AND AGENT—CAVEAT EMPTOR.

1. Where, in a treaty for the sale of property, the vendor makes material misrepresentations, by which the purchaser, having no knowledge, or means of knowledge, in relation thereto, is actually deceived to his injury,—a court of equity will rescind the contract in pursuance thereof, although it do not contain the misrepresentations; and it matters not, in such a case, whether the misrepresentations be the result of mistake or fraud.

[Cited in Ferson v. Sanger, Case No. 4,752; Seeley v. Reed, 25 Fed. 365.]

[Cited in Pratt v. Philbrook, 41 Me. 138; Smith v. Countryman, 30 N. Y. 671; Clark v. Potter, 32 Ohio St. 61; White v. Sutherland, 64 Ill. 191; Durkin v. Cobleigh, 156 Mass. 112, 30 N. E. 474; Colton v. Stanford, 82 Cal. 351, 23 Pac. 16.]

2. But where a purchaser relies upon his own judgment, uninfluenced by any misrepresentations, and has full means of knowledge within his reach, a court of equity will not relieve him from his bargain.

[Cited in Warner v. Daniels, Case No. 17,181; Ferson v. Sanger, Id. 4,752; Marsh v. Whitmore, Id. 9,122.]

[Cited in Port v. Williams, 6 Ind. 222; Gatling v. Newell, 12 Ind. 142; Shaddle v. Disborough, 30 N. J. Eq. 381.]

3. An answer in equity to facts charged in the bill is to be taken to be true, until the contrary is clearly established.

[Cited in Seeley v. Reed, 25 Fed. 364.]

4. Where A and B gave a bond to C, conditioned to make a conveyance of certain timber land, provided C should elect to buy the same on certain terms, within thirty days,—or should make a sale thereof within the same time, in which case, only one half of the excess over a certain price was to be paid to A and B,—and C did make sale of the land, and A and B received one half of the excess of the price over the stated sum, and made a deed of conveyance thereof to the purchaser,—it was held, that C was the agent of A and B in the sale, and they were bound by his representations.

[Applied in Henderson v. San Antonio, etc., R. Co., 17 Tex. 560.]

1 [Reported by William W. Story, Esq.]

5. Where C gave a certificate, that certain lands, which he had "partially explored," contained, "as far as my knowledge extends," a certain average of timber, and it appeared that the purchasers, to whom it was given, had as full means of knowledge as C,—it was *held*, that they were not entitled to place implicit reliance thereon, and make it the basis of their contract; but that they should have investigated the grounds of the opinion therein expressed, and the extent of the exploration by C.

6. Where a bill in equity was brought to set aside a sale of certain timber lands seven years after the purchase thereof, during which time the agent of the purchaser had made two explorations of the land, and had caused a large quantity of timber to be cut therefrom—it was *held*, that the purchasers had full knowledge or means of knowledge of the condition of the lands, through their agent, which they were bound to exercise, before cutting down timber, and locating the property as their own; and that the bill was not maintainable after so great a lapse of time,—particularly as it set forth no new discoveries in relation to the quantity and value of the timber, which might not have been obtained in a single year, and as the evidence was obscured as to material points.

[Cited in Warner v. Daniels, Case No. 17,181; Fisher v. Boody, Id. 4,814.]

[Cited in Dodge v. Essex Ins. Co., 12 Gray, 67.]

7. Whatever is known to an agent is, in contemplation of law, known to the principal, and the latter cannot aver his ignorance thereof.

[Cited in Veazie v. Williams, 8 How. (49 U. S.) 156; Goodenough v. Warren, Case No. 5,534.]

[Cited in Brannon v. May, 42 Ind. 101.]

Bill in equity, to rescind a contract respecting land in Carmel, Maine, and for other relief. The bill in substance · stated, that Joshua Richardson, of Portland, in the state of Maine, merchant, and a citizen of the said state of Maine, and of the United States, Charles Mussey, of the said Portland, merchant, and a citizen of the said state of Maine, and Nathaniel F. Deering, also a citizen of the said state, and of the United States, at a time prior to the twelfth of June, A. D. 1835, were the owners of and seized of, as tenants in common, of certain lots of land, situated in the town of Carmel, in the county of Penobscot, and state of Maine, aforesaid, (here follows a description of the lot), the number of acres in the whole being three thousand seven hundred and ninety-two and one-half acres, more or less. And also being seized of all the ministerial and school lands in said town of Carmel, containing eight hundred and eleven and one-eighth acres, particularly bounded and described in Elijah Hilliard's deed, as treasurer of the trustees of the said fund, dated June 19, 1833. And being so thereof seized, were desirous of selling the same at a great price. And the better to effect the said object, at some time previous to the thirtieth day of June, 1835, and at what particular time being unknown to the plaintiff [Benjamin K. Hough], he prays that the said Richardson, Mussey and Deering may be

holden to disclose and make known, did give to William Moulton, of Portland aforesaid, merchant, a citizen of the said state of Maine, and of the United States, a bond or obligation, conditioned to convey the said lots of land on certain terms and conditions therein set forth and expressed; and the plaintiff charges, that if such were not the fact, that such bond or obligation was given to the said Moulton, (which fact he prays the said Richardson, Mussey, and Deering may be held to disclose), the said Moulton was by them employed, on some terms, as their agent, either for some specific reward, or such sum as the said Moulton could dispose of and contract to sell the same, over and above a fixed stipulated price, to sell and dispose of the said lots of land to the plaintiff and others, or some other persons. That the said Richardson, Mussey, and Deering, combining with the said Moulton, to sell such lots of land or a portion thereof, to the plaintiff or others, at a greatly inflamed price, and well knowing that the said lots of land were, in fact, of little comparative value, and had not standing and growing thereon more than two thousand of sound pine timber to the acre, on an average of the whole quantity of land contained in the said lots, suitable to be sawed and cut into boards, and exclusive of a large quantity of small growing timber, not fit for that purpose; or else being grossly ignorant of the quantity of timber on the said lots, being sound pine timber, and being also grossly ignorant of the actual value of the said lands and the quantity of timber thereon, did, on the twelfth day of June, 1835, procure one George R. Herrick, (who, as the plaintiff charges, either never did partially explore said lands, or else was grossly ignorant, or fraudulently combining with said Richardson, Mussey, Deering, and Moulton, to aid in selling the said lands at a greatly inflamed price), to give a certificate of the following tenor and effect, to wit: "This is to certify, that I have partially explored the lands in the town of Carmel, which are bonded to Mr. William Moulton, and, as far as my knowledge extends, there is an average of eight thousand feet or more of sound pine timber per acre, exclusive of a large quantity of small growing timber, hard wood, cedar, mixed growth, &c. This timber is on good water for driving logs, and the land is good farming land. (Signed) George R. Herrick."

And the plaintiff charges, that the said William Moulton, acting as well as the agent of the said Richardson, Mussey, and Deering, as for himself, and on his own behalf, having thus possessed himself of the said bond or obligation in writing, from the said Richardson, Mussey, and Deering, to himself, and being furnished also with the aforesaid certificate of the said George R. Herrick, did apply to the plaintiff, to become, with others, the purchaser of the said lots of

land, so as aforesaid described; and to induce the plaintiff to become such purchaser, with others, did with the full knowledge, consent, and assent of the said Richardson, Mussey, and Deering, and at their request, exhibit to the plaintiff the aforesaid certificate, as containing a true description of the quality of the said lots of land, of the quality, kind and quantity of timber standing and growing on the said lands; and in addition to exhibiting the said certificate, did then and there represent to the plaintiff, and assure him, that the said lots of land were in all respects equal to what the said Herrick had, in the said certificate, affirmed. And that in truth and in fact, the timber exceeded in quantity the amount specified in the said certificate; and that it would amount to ten thousand, on an average, to the acre, of such timber as was specified in the said certificate. Whereas the plaintiff charges the contrary, and that in truth and in fact, the quantity of timber, such as is specified in the said certificate, and as represented by the said Moulton, did not exceed two, or at most three thousand on the acre, on an average of the whole of the said tract or lots of land, such as specified in the said certificate; and that the said lots of land were in no respect equal to what the said certificate represents, and such as the said Moulton represented and assured to the plaintiff. That the said Richardson, Mussey, Deering, and Moulton, at the time aforesaid, were well knowing, or might by proper and careful inquiry and examination, have well known, that the said lots of land did not, in fact, have standing and growing thereon any such quantity and quality of timber as the said certificate purported, and as the said Moulton represented and assured the plaintiff; and that the said land was, in fact, of a much poorer quality in all respects. That the said Richardson, Mussey, Deering, and Moulton, either did, fraudulently combining to defraud the plaintiff and others, who might become purchasers, falsely and fraudulently obtain said certificate; and through the said Moulton, represent the said certificate to be true, and that in fact there was more timber on the said lots than the said certificate purported; or else, from gross and culpable negligence, and want of proper inquiries and investigation into the capacity and honesty of the said Herrick, and of the facts in the said certificate stated, did impose on the plaintiff as true in relation to all the particulars relating to the said land, and from which a fair and just estimate of its value might be formed, what in fact was wholly untrue. And that relying implicitly and fully, and wholly on the said certificate, and the representations and assurances of the said Moulton, as to the quantity and quality of the timber and other growth on the said land, and of the quality of the said land, and the facility of getting the said timber to a market, the

plaintiff did consent and agree to become the purchaser of five-eighths, in common, of the said lots and tracts of land before described and set forth, at a great and enormous price, to wit, within a fraction of seven dollars and fifty cents per acre. And that on the 30th day of June, A. D. 1835, the plaintiff did, in good faith, carry into full effect the bargain and agreement, so as aforesaid made, through said Moulton, for five-eighths of the said lots of land, and together with one Joseph H. Cotton, one David Kimball, and one Samuel Kimball, who, as the plaintiff avers and charges, under like representations, assurances and inducements, which influenced the mind of the plaintiff, became the purchasers, each of one-eighth of the said lots of land, did pay, and secure to be paid to the said Richardson, Mussey, Deering, and Moulton, the sum of thirty-four thousand five hundred and twenty-seven dollars eighteen one-hundreths as a consideration for the said lots and tracts of land so as aforesaid described; of which said sum the plaintiff did pay and secure five-eighths, amounting to twenty-one thousand five hundred and seventy-nine dollars, and a fraction; and did then and there receive a deed from the said Richardson, Mussey, and Deering, conveying to the plaintiff and the said Cotton, David Kimball and Samuel Kimball, the afore-described lots and tracts of land, to hold to them and their heirs in the proportions of five-eighths to the plaintiff, and one-eighth each to the said Cotton and Kimballs. And thus, as the plaintiff charges, he has been induced and persuaded, (either by a fraudulent combination of the said Richardson, Mussey, Deering, and Moulton, to procure to be made, or to make, a false and fraudulent certificate of the quantity and quality of the said lands, and to fortify it by the assurances of the said Moulton; or, by a gross and culpable mistake on the part of the said Richardson, Mussey, Deering, and Moulton, together with the said Herrick, as to the quantity, kind and quality of the said timber, and the quality of the said land, imposed on the plaintiff as the truth), to purchase five-eighths of the said lots and tracts of land, so as aforesaid described, at three or four times their just and actual value; and to pay and secure to be paid the amount of the said inflamed and imaginary value. All which actings, doings and omissions, by and on the part of the said Richardson, Mussey, Deering, and Moulton, the plaintiff charges to be against equity and good conscience, and tending to the total subverting of the plaintiff's just rights in the premises, and defrauding the plaintiff of his property, and bringing the plaintiff to poverty and ruin. The bill prays, that the said defendants may be required and commanded, on receiving a deed reconveying the title to the said lots and tracts of land, that they may be holden to pay back to the plaintiff the

money he has paid, with interest; and that the said notes and securities given by the plaintiff, and now held by the said defendants, may be given up to the plaintiff, to be cancelled. And that the said defendants may be prohibited and restrained from negotiating the same, and that the plaintiff may be restored to all he has lost by means of the said purchase of the said lands under the circumstances aforesaid; and that such further relief in the premises may be granted to the plaintiff, as to your honors may seem meet and just, according to the course of courts of equity, and as justice in the premises requires.

The answer of Richardson and Deering in substance stated, that on the first day of May, 1835, these defendants and one Charles Mussey purchased of Isaac Frye, Daniel Brown and David Webster certain lots of land in the town of Carmel, and county of Penobscot, being the same described in the complainant's bill, and received a deed thereof, dated May 1, 1835. That, being seized and possessed of the said land, these defendants and the said Mussey, on the thirteenth day of the same May, made and executed a bond to one William Moulton, then of Scarborough, now of Portland, of which a copy is hereunto annexed, and marked "A," and which these defendants pray may be taken as a part of this answer. That at the time of the said purchase by the defendants, and of the execution and delivery of the said bond, the defendants knew nothing of the value and character of the said land except from report, having never examined the same, or caused it to be examined; but they believed it to be valuable, partly on account of pine timber which they supposed to be upon it, of which, however, they did not suppose there was a very large quantity; and their belief of the value of the said land was further and principally founded upon the large quantity of wood which they supposed it to contain, and its nearness to the Bangor market, and to navigable waters. That the aforesaid bond was executed by the defendants, at the suggestion of the said Mussey, and in accordance with what they understood from the said Mussey to be the wish of the said Moulton, and without any representations, or declarations of any kind or description, to the said Moulton, or any other person, touching the character or value of the land, the said Moulton neither requiring nor requesting any information upon the subject, and these defendants, in fact, supposing that the said Moulton knew more about the said land than they did, or could know, he being practically acquainted and conversant with such matters, and they being merchants and having no experience therein. That the defendants made no other bargain or contract at that time, with the said Moulton, than is set forth in the said bond; and that by reason of the non-performance, by the said Moulton, of the conditions thereof, with-

in the time therein limited, all obligation, on account of the said bond, entirely ceased on the part of the obligors therein named.

And the defendants further answering, say, that the bond aforesaid sets forth truly and wholly, all and every kind of bargain and agreement between the defendants and the said Moulton, touching the subject matter thereof; that the said Moulton was never, in any way, the agent of the defendants, or by them employed, in reference to the said land, or for the purpose of disposing of, or selling the same, in any way whatever, or on any terms, other than as appears by the said bond; that the original terms of the said bond were agreed on between the said Mussey and the said Moulton, by the said Mussey communicated to the defendants, and by them assented to, and the said bond executed accordingly. But the defendants aver, that they were no farther interested in the said contract than to receive the sum of five dollars and fifty cents per acre for their interest in the said land, in case the said Moulton should purchase the same, under, and by virtue of the same, that the provision inserted therein, with regard to the further amount of one half of the excess of such sale, over and above five dollars and fifty cents an acre for said land, was for the sole and entire benefit of said Mussey, with which these defendants had nothing to do, in which they had no interest, from which they never received, or expected to receive, any benefit whatever, and of the existence of which provision, if they ever knew it, these defendants lost all recollection—and they aver that no sale was ever effected under said bond, or by virtue thereof, but the same afterwards became wholly ineffectual, and inoperative, as is herein before set forth. And whether the terms of the said bond, with all the circumstances attending the same, from its inception to the time when it became inoperative as aforesaid, made and constituted the said Moulton their agent, these defendants will not undertake to say—but certain it is, these defendants never intended so to constitute the said Moulton, or contemplated any thing more than a sale to him or his assigns, of the interest of these defendants in the land aforesaid, at the price of five dollars and fifty cents per acre, should the conditions of the said contract be complied with on the part of the said Moulton; and these defendants respectfully submit whether, in reference to the facts herein set forth, and those herein after stated, constituting all the transactions between these defendants and the complainant and his associates, the said Moulton can in law, or equity, be considered as in any manner the agent of these defendants, for whose acts they can be held responsible, or as in any greater degree their agent than he was the agent of this complainant and his associates.

And these defendants further answering, say, that afterwards, and before the thirtieth

day of June, A. D. 1835, they were informed either by said Moulton, or by said Mussey, that the said Moulton had contracted to sell the said land, and that he, the said Moulton, was ready to complete the said sale, and to purchase the same of these defendants and the said Mussey, and to pay them therefor the sum of five dollars and fifty cents per acre, if they would consent to sell the same, as was named and set forth in the bond aforesaid, which had then become inoperative, and was in no degree binding upon these defendants and said Mussey. And these defendants were then further informed that said Moulton had agreed to sell the said land to the complainant and others, his associates, and of his, the said Moulton's desire that a deed of the said land might be made and executed to the said complainant and others, and the notes of the said purchasers received in payment therefor, according to the terms of the bond aforesaid, to the said Moulton, in so far as related to the said sum of five dollars and fifty cents per acre. That the defendants agreed so to sell their interest in the land aforesaid, and afterwards, on the thirtieth day of June, 1835, they, with the said Mussey, executed a deed of the said land to the said complainants and others, and these defendants suppose it to be rightly set forth, as annexed to the complainant's bill, but pray that the said complainant may be held to produce the original. That they never did procure the said land to be explored, or assent to the exploration of the same, by any person; that they never knew or heard that the said land had been, or was to be, explored by the said George R. Herrick, nor did they hear of any certificate given by the said Herrick, concerning the said land, until after the service of the subpoena in this case, when they read the statement touching the same in the complainant's bill, to which this is an answer, and when, for the first time, the fact of such supposed explanation and certificate was intimated to them; that they never, until that time, heard of any representations touching the same, made by the said Herrick, or the said Moulton, either verbal or written, and never saw the certificate set forth in the complainant's bill, or heard that any such had been exhibited to the complainant, or any other purchaser, and they were never in any manner conversant of, or assenting to, any such certificate, or the exhibition thereof to any person whatever; and if any such certificate existed on the said thirtieth of June, 1835, the defendants were entirely ignorant thereof. That they have understood, and believe the fact to be, that the said Herrick, in whatever examination he might have made of the said land, or any part thereof, was employed by the complainant and other individuals associated with him, to examine and explore the same, and report thereon to them; and that whatever exploration or examination might have been made by the said Herrick,

was not made until after the complainant, or some one or more of his associates, had examined the said land, or a portion of it, in person, and had contracted with the said Moulton to purchase the same, expressing his or their perfect satisfaction therewith. And whatever report and certificate were made by the said Herrick, the defendants have understood and believe the same were made in consequence of his employment by the said complainant and his associates, and not until after they had contracted to purchase the said lands, and had made a personal examination of the same. That the said certificate, if any such exist, though it purports to be dated on the twelfth day of June, was not in fact made until long after that day. And if any such certificate exists, these defendants believe that the same was given by the said Herrick, by the procurement of the complainant and his associates, for the purpose of enabling them to sell the said lands. That the defendants knew nothing of the said certificate, and of the employment of the said Herrick, if he was so employed, and gave any such certificate. And if any such certificate were given, these defendants do not believe that the complainant or his associates were influenced thereby in the purchase of the said lands, but that the same were purchased on a personal examination by the complainant, or one or more of his associates, and in consequence of his or their perfect satisfaction, derived from such examination, as to the true quality, situation, and value of said lands; for which examination the said purchasers had full power and opportunity, and which examination and inspection the defendants believe, to have been made before the said purchase, to the entire satisfaction of the said purchasers. And the defendants do not believe, that either the said Moulton, or the said Mussey, either made any representations to the said purchasers, or any one of them, concerning the said lands, by which they were induced to purchase the same, or used any artful means to bring about such a result, or were guilty of any of the fraudulent practices set forth in the bill. Certain it is, that these defendants never knew of or suspected any such, or were in any manner conniving thereto. That they originally purchased said lands as hereinbefore stated, without any examination thereof, and relying wholly on report. That they never made any representations to said complainants, or any other persons, as to the value, quality, or situation of said lands, or knew that any such were made by any person, or caused any such to be made, or assented thereto; and that they never saw said Herrick, or his certificate, or heard of any such, until the time hereinbefore stated. And the defendants insist that the said complainant can have no good reason to be dissatisfied with the said purchase, as by his bill of complaint it appears that the said land does contain at least two thou-

sand feet of good merchantable pine timber to the acre, which of itself renders the said lands well worth the amount paid therefor by the said purchasers; in addition to which, the defendants have understood and believe that the said lands contain large quantities of valuable wood, near a market and to navigable water, and also of great value for purposes of cultivation. And the defendants further answering, say, that from time to time as the notes aforesaid became payable, they, by the request of the complainant and his associates, renewed the same in part, and extended the time of payment at their request and for their accommodation, and never knew or suspected that the said purchasers were dissatisfied, or considered themselves injured in the premises, until the service of the subpoena in this case upon the defendants; but, on the contrary, the defendants had every reason to suppose, and did suppose, that the said purchasers were content with their said purchase, inasmuch as they were, and as the defendants have understood and believe, carried on lumbering operations on the said lands, and taken large quantities of valuable wood and timber from the same.

The answer of Moulton in substance stated: That this defendant, being at Bangor in the month of May, 1835, met the said Charles Mussey named in said bill of complaint, who informed this defendant that he, said Mussey, together with Joshua Richardson and Nathaniel F. Deering, also named in the said bill, owned some lands in the town of Carmel, near that city. And whether the said Mussey then proposed to give, or this defendant then requested a bond for the conveyance of those lands for some certain time, he cannot now, at this distance of time, well remember. That this defendant was not then acquainted with the said lands, which he understood were divided in lots, and lay scattered in different parts of the place; and he had no sufficient means of forming any judgment of their condition, growth and value, beyond his having occasionally passed through that town, upon the travelled road; and as he had been led thereby to form a favorable opinion thereof. That the said Mussey thereupon assured this defendant that he was going to Portland, where he should see the said Richardson and Deering, and that if they should agree, this defendant should have such a bond to be given or sent to him by mail. And this defendant accordingly soon afterwards received such a bond, bearing date May 13, 1835. That by the terms of that instrument this defendant was to have the pre-emption of those lands for the time of thirty days, upon payment therefor of five dollars and fifty cents per acre, and one half of all he should receive from any purchaser within that time over that price. And the defendant supposes, that the said lands and lots so agreed to be conveyed, are properly and sufficiently described in the said bill of complaint, and that there is the number of lots and quantity of acres therein set forth; but of this he has no certain and positive knowledge, other than from information received and taken to be true. And he further says, that he had no doubt that the said lots and lands had a certain real value in the soil, and from their situation, beside what they might also have from the wood or timber on the same, and apart, too, from such circumstances depending on judgment and opinion, as might influence the views of purchasers in the then state of the times, speculating upon the prospect of disposing of such property at advanced prices; and the more so from the circumstance that the said lands were divided off into lots for the purpose of improvement and settlement; and that he did in truth believe, that the said lots had a real value from the growth thereon other than timber trees, from the fact that wood lots in the vicinity of Bangor generally, were in demand and commanded a high price. He further also says it is true, that he was led to suppose and believe, that there was some considerable quantity of timber, with other wood on the said lands; but that he had no other or better means of judging, than other men of business like himself, whose attention was drawn to those subjects, and that he did not undertake to form any definite opinion, nor have any fixed and absolute belief in regard to the actual quantity of timber there might be thereon; nor as to the comparative value of the said lots of land in respect to the soil and situation, or various advantages which might give value to the property, in the view of general purchasers. That he did not well know that said lots of land were of little comparative value, and that the same had not standing and growing thereon more than two thousand feet of sound pine timber on an average to the acre of the whole quantity of land contained in the said lots, suitable to be sawed and cut into boards, and exclusive of a large quantity of small growing timber not fit for that purpose. And that true it is, he may have been ignorant of the whole quantity of timber on the said lots being sound pine timber, and that he may have been likewise ignorant of the actual value of the said lands, and the quantity of timber thereon: and he further says, that this complainant, and others connected with him in the purchase hereinafter stated, well enough knew that he was ignorant of the premises, and that he did not pretend to certain knowledge thereof, and that if his ignorance were so gross as alleged in the said bill of complaint, no one knew it to be so, better than the complainant.

And this defendant further answering says, that some time, to the best of his rememberance within the first week of June, 1835, he became acquainted at Bangor, with William Phipps and Henry I. Holbrook, of

Boston, who were inquiring for lands in that quarter, and afterwards with Samuel Kimball, of Boston, who wished to purchase lots in the vicinity of Bangor, and learning that this defendant had such a bond of lands, as he informed them, of four or five thousand acres in Carmel, they all concluded to go and look at them. That on the following morning, the said Phipps, Holbrook, Kimball, one James McLaughlin and this defendant went to Carmel, which was the next town but one to Bangor, for this purpose. It was on the county daily travelled road, and then contained a considerable village, and was increasing in settlement. That they had a small map or plan of Carmel, on which all the lots in that town were laid down and numbered; the lots included in the said bond lay scattered over the town, about a third part of which was then settled; and these lots were at wide distances from each other, varying from a half mile to six or eight miles, as appeared by the said map. And this defendant believes, that the same were without fences, and that their boundaries were not distinguishable by marked lines, but only upon their being ascertained by means of spotted trees; the same being generally uncleared land and much covered with wood. That they made inquiries of persons whom they met, but did not know, as to the character and quality of the land. And they were directed to one lot situated near the road, which they understood to be one of those included in the bond. That they went upon that lot and found some pine, hemlock, cedar, spruce, and many kinds of growth on it. That this defendant then stated to the other persons, with whom he went out, that this was the first time he had ever been upon the land, although he had passed the road, and that they then knew as much about the lots of land as he did. They all returned to Bangor that evening. But nothing more took place in relation thereto until the day after the great land sale, at Bangor, on the 10th day of June, 1835. That on the forenoon of that day, viz., June 11th, 1835, this defendant was again applied to by the said Phipps, Holbrook, and Samuel Kimball, who introduced him to David Kimball, Coffin, and the complainant. These all said that they wanted to purchase land, and that they should wish to buy some as near as they could to Bangor. That this defendant stated to them, that the bond which he had of the Carmel lots before mentioned, was about expiring without leaving sufficient time there for the fulfilment of its conditions, as some of them knew; and that he therefore could not engage to sell unless he could obtain a renewal of the bond. That it was thereupon proposed by them to go out to Carmel to look at the land, and that afternoon they together with this defendant went from Bangor to that place, and went upon the same lot of land that a part of them had been on be-

fore, as above mentioned. And this defendant then stated to the others then present, that it was the same lot that part of them had been on with him during an afternoon before; that they now saw the same that he had seen, and that whether the other lots were better or worse this defendant had no means of knowing; that the complainant and others appeared to be pleased with the lot, and estimated that the wood upon it was worth more and would probably pay all the price of the land from being so near Bangor; that they were together upon the land in this manner about two or three hours, and they all returned to Bangor the same evening; that this defendant was not then prepared to enter into an absolute agreement or bargain for the sale of the said lands, of which he had himself seen so small a portion, as his bond was then expiring, and lands had risen in price, and he did not know whether the owners would give another: and he was also obliged to go up the river at any early hour upon the following morning upon a previous arrangement with the said David Kimball, and Holbrook, and some others. That the complainant and others before mentioned invited this defendant to come to the Bangor House that evening, which he accordingly did, and they then were desirous to effect the purchase; that this defendant told them that he could only engage that they should have the same upon the terms then proposed, provided he could obtain a renewal of the bond from the said Richardson, Mussey and Deering; that they then accordingly entered into an agreement upon that condition, by which the complainant and others aforesaid were to purchase the said lots for seven dollars and fifty cents per acre. And that the bargain or agreement so made on that evening was finished and reduced to writing and signed on the following morning by this defendant, the complainant, William Phipps, the said Samuel and David Kimball, Holbrook and Coffin. That it has been his impression, though he is not now able to recollect so as to state the same with any certainty, that there was some stipulation on his part to pay the said purchasers a certain sum of one or two thousand dollars in case he should not be able to make or procure such conveyance; but that the said paper, if produced, would show whether there was any such stipulation. And whether this defendant was constituted the agent of the said Richardson, Mussey and Deering by virtue of the transaction above described, or whether he became so upon the subsequent agreement between himself and them in regard to the sale of the said land as hereinafter set forth, is a matter which he respectfully submits to the judgment of this honorable court. That he was not otherwise their agent, and if he did act in any manner on behalf of the said Richardson, Mussey and Deering, it was in good faith, and without any fraud-

ulent intent or combination with the said Richardson, Mussey and Deering, as charged in the said bill of complaint; that is to say, to sell said lands at a greatly inflamed price, and with sufficient knowledge that the same were of little comparative value; and he denies that he had in fact any such motive, design or knowledge, as is thus untruly and unjustly imputed.

And the defendant further answering says, that this was all and the only bargain or contract that was ever made or entered into between himself and the complainant and others, parties in relation thereto; and that an appointment was then made by the parties to meet at Portland on the ensuing thirtieth day of June, for the purpose of carrying the same into effect. That at this time he is sure he made no statements of what there was on the said lands, unless it may have been to express his opinion from what he then saw, as he had no knowledge of the same further than he has already mentioned by seeing the same with those who went out with him as stated, and he had no further means of judging than they had, and did not undertake to make any representations other than he has already set forth, of which they knew the grounds as well as he did, and had the same opportunities for observation. That this defendant told them at that time, that they must look and judge for themselves, and that they could bargain upon no other condition; and he denies that the said bargain was made with exclusive or especial reference to the same being timber lands, and says that if such had been the sole object of the purchasers, they would rather have sought elsewhere and in some other and more remote section. But that regard was had in making the said bargain and in all their conversation respecting the same, while they were looking at the land and throughout the transaction, to the general value thereof from its situation and vicinity to Bangor, and its suitableness for settlement and other advantages, as well as the wood and timber thereon. That the contract was made and the arrangements were completed in the course of that evening and the following morning; and on the same morning, to wit, June 12, 1835, at an early hour after this transaction was concluded, this defendant and the said David Kimball and Holbrook, with some others, proceeded up the river according to their previous agreement before mentioned. And the defendant denies that the said Richardson, Mussey, Deering or himself, did, on the said 12th day of June, procure the said George Herrick to give a certificate, such as is alleged and set forth in the said bill of complaint, in regard to the said lands, or that the said Herrick had any thing to do in or with regard to the said transaction, or in making any such certificate, prior to the said bargain and agreement. And the defendant denies, that the complainant or any of the said parties named in the bill of complaint, at or prior to the

time of making such bargain and agreement, had or could have had any knowledge or idea of such pretended certificate. And the defendant denies, that the matter thereof, as therein expressed and as pretended in the said bill of complaint, had any influence upon the minds of any of the said parties proposing to purchase as aforesaid, to induce them to enter into any such purchase, and in particular upon this complainant. And he further says, that no such certificate was then produced or exhibited as therein pretended, or even in fact existed. And that the said David Kimball and Holbrook, and the defendant, who went up the river as aforesaid on the 12th of June, proceeded to a considerable distance and were gone ten or eleven days; and that no such certificate was made or could have had any existence in any manner with the agency or knowledge of this defendant, during that time, or until after their return to Bangor. That the first conversation respecting the procurement of any certificate in relation to the said lands, to his knowledge, took place between the said David Kimball, or the said Holbrook, and the defendant, in coming down the river on their return, or soon afterwards; and that it was then suggested by one of them, and as the defendant thinks by the said David Kimball, that it would be of use for future sale to have a certificate of that kind, and the defendant was accordingly requested to aid in procuring one. That he objected that he should not have sufficient time to go upon and explore the said lots properly; but that at their request the defendant employed the said George Herrick to go to Carmel for that purpose. That the said Herrick lived within a few miles of the town, and was supposed to have some acquaintance with the said lots, and went out accordingly, accompanied by the defendant. That they left Bangor in the morning, and partly explored the said lots, and returned to Bangor the same day; the said Herrick at that time only partially exploring two of the said lots; and he was paid for his services by the defendant the sum of five dollars, and no more, with the understanding on the part of the defendant, that he was to be repaid the same by the said purchasers.

And the defendant further answering says, that the certificate of the said George Herrick set forth in the said bill of complaint, as purporting to be dated on the twelfth day of June, 1835, if so dated, could only have been so by mistake, or at the instance and wish and with the intention signified as aforesaid, and after the completion of the defendant's contract with them as before mentioned; that the further exploration or examination by the said Herrick aforesaid was only so made at the instance of the said purchasers and the certificate so made on their procurement and behalf as aforesaid; that they or some of them, as the defendant was informed and believes, made further in-

quiries and examination for their own proper satisfaction, after their separation at Bangor on the said twelfth of June and before their meeting at Portland on the thirtieth, and in fact before the making of the said certificate by the said Herrick. And that the complainant and the said Samuel Kimball afterwards severally at different times told the defendant, that they had been upon the land together part of two days, at some time between the twelfth and twenty-second days of the said June, and being asked by the defendant how they found it, said, better than they expected, or to that effect. And the defendant further denies, that in any intermediate disposition made by the said parties and purchasers, or any of them in respect to the proportion they should take of the said lands, after making the said contract with the defendant, and before carrying the same into effect, to wit, on the said thirtieth day of June, there was any exhibition or use made of such alleged certificate, either to the complainant or others.

And the defendant further says, that it was but a few miles from Bangor to Carmel, on the common stage route to Augusta; and that several of the lots did not lay more than ten miles off; and that the character of the land and growth was equally open to observation by all who had the opportunity to visit the spot and would take pains to look or inform themselves; that it was well understood by those who went out with the defendant to Carmel to see the land as aforesaid, that it was a mixed growth of various kinds, and this corresponded with their observation so far as they saw, as well as with that of the defendant so far as he went on and examined; that the said Herrick only partially explored and examined the same, and made the same general observation, and expressed the result in terms according to the extent of his knowledge, and to his means of judgment, and no farther; nor did the defendant pursue any farther observations or inquiry. That the defendant did not and could not undertake to form any positive judgment or opinion of his own in regard to the quantity of pine timber on said lands, of which he could only form a very imperfect estimate or idea from the opportunities which he has before mentioned, in which respects he could judge no better than others who had the same opportunities, or than those who went with him. And he had no certain knowledge or opinion and belief in the premises, nor did he ever undertake to represent and guarantee that said lands contained eight thousand feet or more of pine timber to the acre, exclusive of all other growth; and he further says that he never did intend to assure the said purchasers or any of them that there was such a large quantity of pine timber on the said lands, as is now set forth and pretended in the said bill of complaint. That the defendant, after making the said agreement with the complainant and others,

and after his return down the river, applied to the said Mussey, to know if he could have a renewal of the pre-emption, and informed him that he, the defendant, had made an agreement to sell the lands mentioned in the bond upon that condition. That the said Mussey was at first unwilling to renew the said bond, as he said he had been offered more for the land; but understanding that the defendant had actually made such conditional agreement, the said Mussey consented to sell the same at six dollars an acre, provided the said Richardson and Deering would also assent.

And the defendant further says, that, agreeably to the appointment made on the twelfth of June as aforesaid, at Bangor, the complainant, the said Samuel Kimball and William Phipps, on behalf of the persons so agreeing to purchase, met the defendant on the thirtieth day of June, when the said agreement was carried into effect; the consideration or price was paid or secured in money and notes with mortgage, as previously agreed upon, and the lands were conveyed by the said Richardson, Mussey and Deering to the said purchasers at their request, in the following proportions, instead of the proportions expressed in the memorandum aforesaid. The said David Kimball and Cotton not being themselves present, but sending their money and notes for their respective proportions by the complainant, who received the deeds for them. That the said Richardson, Mussey and Deering conveyed five eighths of the said land to the complainant, and one eighth to the said David Kimball. one eighth to the said Samuel Kimball, and one eighth to said Cotton, at the price agreed, and it was paid for by the said purchasers in their respective proportions. That the defendant received of the said purchase money, six thousand nine hundred and five dollars and sixty cents in money and notes, and from the complainant the defendant received four thousand three hundred and sixteen dollars, one fourth part in money and the rest in three notes for one thousand and seventy-nine dollars each, which have since been paid. And the defendant denies, that he ever did exhibit the aforesaid certificate made by said Herrick as containing a true description of said lots of land—of the quantity, kind and quality of the timber standing and growing on the said land, nor make the representations and assurances in addition to the same, as stated and set forth in the said bill of complaint. And he further says, that he did not use the said certificate with the knowledge, consent and assent of the said Richardson, Mussey and Deering, or either of them, as therein alleged and inquired of; and says that he did not express and declare to the complainant, the said Samuel and David Kimball and the said Cotton, or either of them, that the facts said to be certified in the said certificate in relation to the said

lots or tracts of land were true, or that they were true to the best of his knowledge, understanding or belief, either in terms, effect or substance—or that there was in fact more timber than was specified in the said certificate, as inquired of; and that he did not represent to the complainant and the other purchasers as aforesaid or either of them that full reliance might be placed on the certificate of the said Herrick, or on the correctness thereof as therein set forth and inquired of. And the defendant further denies that the complainant was grossly or in any wise deceived and defrauded by relying on the said certificate, and the said representations of the defendant in relation thereto, or touching the same as aforesaid; for he says that the said certificate did not exist at the time of the said agreement, nor until after the complainant left Bangor, on his return, as the defendant understood and believes, to Boston; and that the defendant did not again see him until the said thirtieth day of June, when the said contract was carried into effect, and the business finally completed; and that the said certificate was in the mean time in the hands of the defendant, and that the purport thereof was not communicated to the complainant by him, nor by any one else, as he believes. That after the said conveyances were executed on the thirtieth of June, as above mentioned, the defendant delivered the said certificate to one of the said purchasers, and as he thinks to the complainant; and that before this time neither the complainant nor either of the said purchasers saw any such certificate, so far as the defendant knows and believes, or had any knowledge of the contents thereof. And the defendant further denies, that he ever represented to the complainant and assured him that the said lots of land were in all respects equal to what the said Herrick had affirmed in the said certificate, and that the timber exceeded the quantity or amount specified in the said certificate, and that it would amount to ten thousand on an average to the acre of such timber as was specified in the said certificate. That if there were, in truth and fact, only two or three thousand feet of pine timber on an average to the acre of the said lands, all together, as now set up by the complainant; and if the said lots of lands were in no respect equal to what the said certificate represents, of which the defendant denies that he made any such assurance, the said complainant had at the time mentioned as good means as either himself or the said Mussey, Richardson or Deering had of knowing the truth thereof, and might as well by proper and useful examination and inquiry have known whether the said lots of land did, in fact, have any such quantity and quality of timber standing and growing thereon as pretended, and that the said lots of land were of a much poorer quality in all respects, if, in fact, they were

so. That all the proper import and intent of the said Herrick's certificate was on behalf of the said complainant and those who became purchasers by the said agreement in offering the said lands again for sale, to induce those to whom it might be exhibited, respecting such favorable account of a partial exploration, to extend their examination so as to ascertain how far such estimate and supposition was correct; and no farther or otherwise. And the defendant further says, that he was not present at the time the said certificate of the said Herrick was made, nor did he know the purport of the same before receiving the same from the said Herrick, which was about the twenty-fifth day of June, 1835, immediately after the same was made, and before the defendant left Bangor for Portland, which he did soon after, bringing the said certificate with him; and that he retained the same until he delivered it to the complainant after the completion of the business, as before mentioned, on the thirtieth of June. And the defendant further says, that he then knew no reason to doubt the correctness of the estimate or judgment of the said Herrick, so far as it went, as it was expressed; but that he did not consider it of any importance as to the bargain, which had already been made, and well denies that the matter therein set forth existed as matter of belief in his own mind or that of the said purchasers, at the time of making the said agreement, or that any mistake or misapprehension then existed, founded on the matter set forth in the said certificate, or any further representations or statements in relation thereto, or could by any possibility exist.

And the defendant further answering says, it may be that the complainant and others, purchasers, have been disappointed in their expectation of making a profitable and advantageous resale and disposition of the said lots, and in the result of their purchase for that purpose, and that the same may have happened in consequence of a great subsequent depression of business and depreciation of property from causes of general notoriety; and that the complainant might now be glad to annul and rescind the transaction, if it were in his power, and recover back the money he has paid. But the defendant further says, that he was not aware that the complainant wished to rescind the said contract and transaction, or was willing and desirous to reconvey the said lots and tracts, or that he expected any such restoration from the defendant and others, as he pretends in his said bill of complaint, and denies that the complainant had any ground therefor. And he further says, that the subsequent payments or settlements were all made by the complainant and his associates in the said purchase, without making any complaint of injury, imposition, or deception of any kind. And the defendant further expressly declares, that he never heard of any

cause of dissatisfaction and complaint in regard to the circumstances of the said sale and purchase, until he was surprised by the commencement of this present and other accompanying suits of the said Samuel and David Kimball and the said Cotton. And he denies that he ever received any previous notice or intimation from the complainant or others, that he or they considered themselves in any manner aggrieved, or that any undue advantage had been taken, or imposition practised in the premises. And he further says that the said payments were not completed until more than five years after the time of the said transaction, and that it was not till afterwards, that this and the other aforesaid suits were brought, and that, in the meantime, the said purchasers had ample opportunity to have further explored, or ascertained and made known to him and his co-defendants the causes of their complaints. And he further says, that he is not informed when the complainant and his co-purchasers first discovered or pretended to discover the alleged difference in the quantity and quality of timber on the said lots, and the other circumstances on which they pretend to ground their petition for relief.

And the defendant well believes, that whatever there may have been in the manner complained of by the complainant and others therein associated with him, which they now set forth as true, and as entitling them to the relief prayed for in this and their several other bills of complaint, might as well have been known to him and them at some or any former time within the last six years, if due diligence were used to ascertain the same; if the same were not actually known to the complainant, of which the defendant has no knowledge or information, and prays that proper proof of such diligence, as well as of the truth thereof as aforesaid, may be required of the complainant. And the defendant prays the judgment of the honorable court, whether, after the lapse of so much time and after such changes as may or actually have taken place in the circumstances and value of the said property, by taking off the timber and otherwise, it will set aside the said agreement and conveyance; and inasmuch as the defendant denies that any such fraud as alleged, stated and charged in the said bill was, in fact, practised; and he further denies that either he or any of the defendants, to his knowledge or belief, have concealed or attempted to conceal from the complainant and his co-purchasers, or used any means whatever to conceal from him or them any matter or thing material to his allegations in the premises. That he has faithfully endeavored to answer the allegations and circumstances stated in the said complainant's bill of complaint, fully, directly, explicitly and truly, and according to his best knowledge, recollection and belief thereof; and that if there should be any mistake in any part of his statements, (of which he is not aware,) the same is not owing to any carelessness or inconsideration on his part, but that it is mainly attributable to the lapse of time, and undisturbed reliance upon the substantial truth of what he has herein stated, in the absence of any occasion that he was sensible of for the more diligent and careful preservation of facts and papers, and particular memory of circumstances.

A cross bill was filed by the defendants, Moulton. Richardson and Deering, against the plaintiff, but the important facts stated therein so fully appear in the previous bill and answer, that it is here unnecessary to repeat them.

The general replication was filed; and evidence was taken and the cause now came on for a hearing at this term upon the bill and cross bill.

Deblois & Fessenden, for plaintiff.
William P. Fessenden, for Richardson.
C. S. Daveis, for Moulton.

Mussey being out of the state did not appear; and Deering having been discharged under the bankrupt act [of 1841 (5 Stat. 440)], no farther proceedings were had against him.

STORY, Circuit Justice. This cause has been very fully and ably argued, and is not unattended with difficulties. The bill is, in substance, a bill to rescind a contract made or asserted to be made with the defendants, for the purchase of certain lots of land in the town of Carmel, in Maine, and for other consequent relief. Several points have been made at the bar; and among those most material to be considered are the following questions: (1) Whether the defendant, Moulton, in making the sale of the lots in question, acted as the agent of the other defendants, or as principal on his own account. (2) Whether there was any material misrepresentation made by Moulton to the plaintiff at the time of sale, on which the plaintiff relied as a true representation, and which constituted the basis of the sale. (3) Whether the lapse of time since the sale, and before the bringing of the bill, connected with the other circumstances of the case, furnish a sufficient ground, upon which this court, sitting in equity, ought to deny the relief asked by the bill.

Upon the first of the questions, I cannot say, that I perceive any reasonable ground for doubt. It appears to me, that, taking the circumstances together, the sale was made by Moulton, not as a principal on his own account; but as the agent of the other defendants. The bond given to Moulton by the other defendants, in the condition, after reciting; "And whereas we have agreed to sell and convey the same (lots) to said Moulton, or his assigns, provided he shall, within thirty days from this date, elect to purchase the same at the rate of five dollars and fifty cents for each and every acre thereof, payable one quarter part thereof in cash on the delivery

of the deed, and the remainder by good notes, in three equal payments, with interest annually from this date, secured by mortgage or otherwise, to the satisfaction of said obligors, and also in case of a sale of the same by the said Moulton within the said thirty days, the further amount of one half of the excess of such sale over and above five dollars and fifty cents an acre,"—proceeds to state: "Now, if the said Moulton shall elect to purchase said land, or shall make a sale of the same within the said thirty days, and shall perform the several conditions aforesaid, and said obligors shall and do thereupon execute and deliver to the said Moulton or his assigns, a good deed of general warranty of the premises, then this obligation shall be void, otherwise shall remain in full force and virtue." It is plain, from this language, that the vendors (the obligors) contemplated two alternatives, one a sale to Moulton himself at his election, to be made within thirty days, at a fixed price, the other a sale to be made by him to other persons or purchasers, at a higher price, of which, if made, they were to receive one half of the excess beyond the fixed price. It is very certain, that Moulton did not make any such election to purchase at the fixed price on his own account. The sale actually made by him was to other persons as purchasers, and among them the plaintiff; and one half of the excess was to be, and was actually accounted for to the plaintiffs. The sale was, therefore, manifestly made by Moulton for the other defendants, as their agent, since he did not elect to become himself the purchaser; and they had an interest in the sale co-extensive with the purchase money, he, Moulton, receiving the one half of the excess only, and that as in the nature of a compensation for his services. It is no answer to suggest, that the other moiety of the excess was received by and was for the sole benefit of Mussey, one of the vendors—for, if so received, it was a mere private affair between Mussey and his co-vendors—with which the purchasers and Moulton had nothing to do; and the interest in the sale was the same in all the vendors, and through one and the same agent. And besides, the bond itself treats the moiety of the excess as belonging to all the vendors, and they cannot be permitted now to aver their ignorance of this clause in the bond. It is also wholly immaterial, whether the sale was made within the thirty days or afterwards; for if made afterwards, it was adopted by all the vendors, and bound them as a sale through their agent; and they, and not Moulton, gave a deed of conveyance to the purchasers accordingly.

The sale, then, being made by Moulton, not as himself the owner—which he was not—but as the agent of the owners, it follows, that they are bound by his representations made at the time touching the sale, as a part of the res gestae, and as to the purchasers, it makes no difference whether these representations were made by the authority of the

owners or not, if they were material to and constituted the basis of the sale, and it was made by the purchaser on the faith and credit of these representations. Under such circumstances, the sale is good in the entirety, or not good at all. The owners have no right to insist upon the validity of the sale independent of the representations. The whole must be taken together as a part of one and the same transaction. It cannot be adopted in part and rejected in part. It must be taken as good for the whole or not at all. I have on several occasions expressed my opinion upon this point; and especially in the case of Daniel v. Mitchell [Case No. 3,562], and in another case recently argued,—Doggett v. Emerson [Id. 3,960],—and decided in favor of the plaintiff. The case of Small v. Attwood, Younge, 407, and the same case on appeal (Attwood v. Small, 6 Clarke & F. 232), go far to support the same doctrine, although somewhat distinguishable in its circumstances.

Let us then proceed to the consideration of the second question, and that is, whether any false or material representations were made upon the sale, and which constituted the basis of the sale on the part of the purchasers, and by which they were, in fact, misled in the purchase. And here it is important to state, that both facts must concur, there must be false and material representations, and the purchaser must have purchased upon the faith and credit of such representations. It is not necessary, that he should have solely relied on these representations. It is sufficient if they constituted a part of the res gestae, upon which he relied, and without which the purchase would not have been made. There is another consideration, applicable to the circumstances of the present case, which is fully sustained by the case of Attwood v. Small (in the house of lords), 6 Clarke & F. 232, and which, perhaps, cannot be more briefly expressed, than it has been, with a slight addition, in the marginal note of the reporters. If, upon a treaty for the sale of property, the vendor makes representations (touching the nature and character and value of that property) which he knows to be false, the falsehood of which the purchaser has no means of knowing, but he relies on them, a court of equity will rescind a contract so entered into, although it may not contain the misrepresentations. But it will not rescind without the clearest proof of fraudulent misrepresentations, and that they were made under such circumstances as show that the contract was based on them. But if a purchaser, choosing to judge for himself, does not avail himself of the knowledge or means of knowledge open to him or to his agents, he cannot be heard to say, that he was deceived by the vendor's representations, the rule being caveat emptor, and the knowledge of his agents being as binding upon him as his own knowledge. Now, this doctrine is, in both its aspects, just as true as to

gross misrepresentations, made by mistake, going to the essence of the bargain, as it is to the misrepresentation founded in fraud;—I do not say morally, but in construction of law. If the purchaser relies on them, and is deceived, he does not buy what he intended, and he is misled to do what he would not otherwise have done. But, then, on the other hand, in cases of mistake, the bargain must have been made in strict faith and reliance upon such gross misrepresentations; and if the purchaser has acted upon his own judgment, uninfluenced by such misrepresentations, and has within his immediate reach full means of knowledge, and has declined to use those means, then he has no right to complain of his bargain. And here again the proof should be clear, that there has been gross misrepresentation, and that the purchaser has been seduced into the bargain by them.

Now, keeping this whole doctrine in view, in its various aspects, one is obliged to pause in the present case, and cannot escape from the consciousness that there are difficulties about it. In the first place, what were the misrepresentations made by Moulton? I do not understand, that there is any satisfactory proofs to overcome the full denials of his answer, that he made any positive representations of the nature, and extent, and value of the timber on the lands—as within his own knowledge. On the contrary, if he is to be believed, he made no representations, which ought to have been relied on by any one; he expressed to the purchasers, who went on the land with him, that he had no previous knowledge thereof, and had no better means or opportunities of knowledge than they had, at the time when they partially explored a part of the lots. The general rule in equity is, that an answer responsive to the facts alleged and charged in the bill is to be taken to be true until the contrary is established It is not necessary in the present case to say that Moulton's answer is placed beyond all doubt or question. It is sufficient to say, that it is not absolutely overcome by full, clear and positive testimony, or by controlling circumstances. There are some circumstances in the case, which go to corroborate it; and, at all events, I cannot say, that its credibility is satisfactorily impeached. It is also to be taken into consideration, that some portion of the opposing evidence comes from sources not altogether disinterested—since it is given by persons who are co-purchasers, and whose claims are yet subject to litigation. In the next place, what is the misrepresentation complained of? It is alleged in the bill, that, at the time of the purchase, a certificate was shown by Moulton to the plaintiff and his co-purchasers, as containing a true description of the land, and upon the faith of which the purchase was made, and that it was false in substance. The certificate was as follows: "June 12, 1835. This is to certify that I have partially explored the

lands in the town of Carmel, which are bonded to Mr. William Moulton, and, as far as my knowledge extends, there is an average of eight thousand feet or more of sound timber per acre, exclusive of a large quantity of growing timber, hard wood, cedar, mixed growth, &c. This timber is on good water for driving logs, and the land is good farming land. George Herrick." Now, upon this certificate there are several observations forced upon the court by the evidence. The very date—whether it was the true date, is a matter of controversy. The plaintiff insists that it was actually made and dated on the 12th of June, 1835, before the sale, and then shown to the purchasers. On the other hand, the defendants contend, that it was not made until the 23d of June, at least two days after the purchase, and then was made at the suggestion of the purchasers. Undoubtedly the actual date on the face of the paper is prima facie evidence, that that is its true date; and there is much evidence in the case in support of this view of the matter. But it is encountered by very strong circumstantial evidence on the other side, and of the most unexceptionable nature. It is certain, that the purchasers went with Moulton on the land and made some partial exploration of some of the lots on the day before, or the very day of the purchase, and before it was completed. It is as certain, that Herrick did not go on the land on the same day with them. It appears from the testimony of McLaughlin, an inn-keeper at Bangor, that, by his memorandum book, Moulton went up the river on the morning of the 12th of June, and that he did not return to Bangor until the 22d of June, and that Moulton and Herrick went out to Carmel together on the 23d of June. And Herrick states, that he was only once on the lands with Moulton, and that his certificate was made after his return from that exploration. If this be true, then it is clear that the certificate was antedated; and that it was actually made ten days after the purchase was completed. Herrick, indeed, states, that he believes the certificate is truly dated, because he was in the habit of giving the true date to papers signed by him. It is to be recollected, that the testimony of Herrick was not taken until November, 1842, seven years after the transaction. But the memorandum book of McLaughlin is a written memorandum made at the time, and therefore more likely to be correct, it being made in the course of his business, than the mere recollections of Herrick at such a distance of time. I confess myself to be in no small degree embarrassed by the state of the evidence on this point, looking at all the circumstances, and if my judgment were compelled to decide one way or the other, I should incline rather to think, that the certificate was antedated. But the way in which I wish to put the point is, that it is a matter of grave doubt, and necessarily obscured by the lapse of time, upon which a court of equity can have no

security, that it can act either safely or wisely in granting relief upon such a ground.

Then, again, as to the terms of the certificate. Herrick is the plaintiff's own witness; and I do not understand, that his good faith in giving the certificate is impeached, or that he has not truly stated what was his real opinion and judgment so far as the explanation went. Now, what is the just purport of his certificate? Upon its very face it states that he had but "partially explored" the lands; and he cautiously adds that "as far as my knowledge extends" there is an average of timber as stated in the certificate. Now, although the certificate is dated on the very day when the purchase was made, and, if truly dated, Herrick must have then been at Bangor with the plaintiff and his co-purchasers, they did not make any inquiries of him on the subject; what exploration he had made, its extent, its thoroughness, and his means of knowledge—or what he meant by a partial exploration. Yet these inquiries were most important to the purchasers, if they relied on his certificate as the basis of their purchase. If, indeed, the certificate was not given until the 23d of June, that would explain the omission to make any inquiries; but then it would be fatal to the claim set up by the plaintiff. But if the certificate is truly dated, how can we account for the total omission of any inquiries of Herrick by the plaintiff and his co-purchasers, otherwise than upon the supposition, that it had not any decisive influence upon the purchase. Indeed, it would be strange, if a certificate, so vague and indefinite, referring only to a partial exploration, and not affecting to state any adequate means of knowledge, and assigning no extent of examination, could have had any great influence in the purchase of fourteen lots, amounting to 3792 acres or land in a township like Carmel, which had been settled many years, and where there must have been inhabitants engaged in farming, capable of giving precise information. Besides, the township was but a short distance from Bangor, where the bargain was made. It was easily accessible; and, in point of fact, the plaintiff and his co-purchasers went on some of the lots with Moulton, for the purpose of an exploration, before the purchase was made; and partial as their examination was, they did not, by what they saw, decline to make the purchase. Here, then, the purchasers had a full opportunity of exploring for themselves, of making satisfactory inquiries upon the spot from the inhabitants, and of deliberately ascertaining the true value of the land, and the amount of timber thereon. Here, then, we have a case falling within the line of the reasoning in Attwood v. Small, 6 Clarke & F. 232, where the purchasers do not choose to avail themselves of the knowledge or the means of knowledge open to them as to all the material circumstances of the value of the land and the amount of the timber thereon, and yet ask the court to grant them the same relief as if they had possessed no such means of knowledge, and had availed themselves of all reasonable diligence. Under such circumstances in the case of Attwood v. Small, the house of lords thought, that the purchasers ought not to be heard to say, that they were deceived by the vendor's representations.

There is another consideration applicable to this part of the case. It is, that the plaintiff and his co-purchasers had no right to rely upon the statements of a certificate so vague and indefinite, so partial and so inconclusive. In Trower v. Newcome, 3 Mer. 704, Sir William Grant held, that when a representation made upon a purchase was vague and indefinite, its only effect ought to be to put the purchaser upon making inquiries respecting all the circumstances previous to his becoming the purchaser. In Scott v. Hanson, 1 Sim. 13, Mr. Vice Chancellor Shadwell fully recognized the same same doctrine, and said that a representation, that the premises sold were "uncommonly rich water meadow land," applied to the quality of the land, and not to its being perfectly watered; and that the representation must be deemed a loose opinion in which the vendee ought not to have placed and could not be considered to have placed any reliance, that it was perfectly watered. Now certainly nothing could be more vague and indefinite as to the extent of knowledge and the extent of the exploration of the premises by Herrick, than this certificate. It should have stimulated and not lulled farther inquiries. And if it contained truth so far as Moulton and Herrick then knew or believed as to the state of the land, but was too indeterminate and loose reasonably to have become the basis of the bargain, or actually at the time to have misled the purchasers, it surely ought not now to affect any of the defendants. Besides, the plaintiff and his co-purchasers went on the land themselves with Moulton, and explored for themselves as far as they chose; and they could not but know from the very form of the certificate, that Herrick had made but a partial exploration, and, therefore, that they had as good means to judge as he. If Moulton is to be believed, he had no more knowledge of the land than the purchasers, and he went on the same for the first time with them, and so told them. It is no where satisfactorily shown by the evidence, either that Moulton knew more, or had any peculiar means of knowledge beyond that of the purchasers, as to the state of the land.

But the great and grave question in the cause is, after all, the lapse of time connected with the other circumstances of the case. It is clear from the plaintiff's own statement, that he did not buy the lands on speculation for an immediate sale, for he says in his answer to the cross bill, that he bought "with

a design to keep the lands, as he supposed lands so well timbered, in the vicinity of Bangor, must be very valuable to be preserved for the timber and wood." The conveyance was made on the 30th of June, 1835, and a mortgage given back to the grantors on the same day, to secure the purchase money by three annual payments by the grantees of their respective proportions of the purchase money. That the plaintiff and his co-purchasers took possession of the lots is none doubted. Agents were employed by them, and among others, William Loker, an inhabitant of Carmel, was employed, as agent for the lands, from 1835 to 1840. During this time about 33,000,000 feet of pine timber were cut off of the land under the direction of the agents. But what is most important in this part of the case, Loker had been employed for about two years before as agent of the then proprietors of the land, and in 1834, at their request, he made an exploration of the lands. He began his examination in the autumn of 1834, and completed it in March, 1835; and he then estimated the pine timber on the lots at 13,000,000 feet. Since his agency ceased in 1842, he made an exploration of the lots with one Joseph Maddocks, and he then estimated the pine timber thereon at 6,120,000 feet; and in his testimony he states as his opinion, that since 1835 there had been as much pine timber cut off of the lots, which had not been accounted for (part I presume by trespassers) as had been accounted for; that is, as I suppose, an amount equal to 33,000,000. I am aware, that Maddocks and Usher make a lower estimate, from 4,752,000 to 4,970,000 feet; and Fuller and Heald as low as 2,218,000 feet. But I do not rely upon any of these estimates as decisive of the cause. What I proceed upon is, that the plaintiff had through his agent, Loker, full knowledge and means of knowledge of the state of the lots and the probable quantity of timber on them during the period of Loker's agency from 1835 to 1840. I say the plaintiff had knowledge and means of knowledge through Loker, for what the agent knows in the course of his agency, the principal is presumed in law to know, and cannot be heard to aver his ignorance. This doctrine was clearly laid down in Attwood v. Small, 6 Clarke & F. 232, 233, 351. The plaintiff and his co-purchasers having full means of knowledge within their reach, were bound to make due inquiries (and their agent had the fullest means of knowledge;) they had no right to go on and cut down the timber year after year, and proceed to treat the property as their own, and then, at the distance of six years, when the value of the property had been essentially changed, by the state of the market, by depredations upon the property, and by the public reverses growing out of the extravagance of timber speculators, to turn round and insist, that the defendants, Richardson, Mussey and Deering, the two

latter having become insolvent, shall take back all the property and bear all the losses incident to such a bargain, after such a lapse of time. If the plaintiff had come earlier, the defendants might have had far better means of meeting the exigencies of the case, and of repelling the allegations of the bill. We are also to take into consideration the circumstance, that Carmel was a township in the course of settlement for agricultural purposes, and not a township composed merely of what is expressly called wild lands, and bought solely for the sake of the timber thereon, as a matter of immediate speculation and sale; and the plaintiff and his co-purchasers do not appear to have expressed any dissatisfaction with the purchase during the whole time of Loker's agency. Neither does the bill state or affect to state any new discoveries made, as to the quantity and value of the timber, which might not by reasonable diligence have been obtained within a single year after the purchase. Indeed, the bill is silent as to any time when, or means by which the discovery of the supposed misrepresentation was first brought to the plaintiff's knowledge. Yet it is most manifest, that the very lapse of time since the purchase and the change of circumstances must constitute a strong objection to the maintenance of the suit. I have had occasion to consider this subject with a scrupulous attention in several recent cases; and especially in Sanborn v. Stetson [Case No. 12,291], and Veazie v. Williams [Id. 16,907], at the present term. The case of Vigers v. Pike, 8 Clarke & F. 562, in the house of lords, furnishes much wholesome instruction to assist us in the administration of relief in equity in cases of this sort. Upon that occasion, Lord Cottenham said: "In a case depending upon alleged misrepresentation as to the nature and value of the thing purchased, the defendant cannot adduce more conclusive evidence, or raise a more effectual bar to the plaintiff's case, than by showing, that the plaintiff was, from the beginning, cognizant of all the matters complained of, or, after full information concerning them, continued to deal with the property and even to exhaust it; as by working mines."—And again: "The doctrine of carrying equities by acquiescence I consider to be one of the most important to be attended to; for otherwise there is great danger of the principles of a court of equity, thus improperly exercised, producing great injustice. A man who, with full knowledge of his case, does not complain, but deals with his opponent, as if he had no case against him, builds up from day to day a wall of protection for such opponent which will probably defeat any attack upon him." Every portion of this language is strictly applicable to the present case; and if we simply add that ample means of knowledge is equivalent to actual knowledge, and that knowledge of the agent is knowledge of the

principal, the doctrine would seem conclusive upon the merits of the present suit. Upon the whole, my judgment is, that the plaintiff's bill ought to be dismissed, with costs for the defendants.