SPRINKLE v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit.   July 5, 1917.)

No. 1515.

POST OFFICE ⊘⟹49—USING MAIL TO DEFRAUD—FRAUDULENT SCHEME.

    Where defendant opened a piano store, advertised prizes for solution of the simplest puzzle, mailed to each of many and planned to mail to the others of the 32,000 answering "as one of the contestants" in the prize puzzle contest a letter containing check of $125 applicable on "sale price" of $187 of instrument "regularly listed by factory to sell for $250," and in the nine days of business before arrest sold 119 instruments, a conviction under Pen. Code (Act March 4, 1909, c. 321, 35 Stat. 1130 [Comp. St. 1916, § 10385]) § 215, of using the mail to defraud was warranted; the evidence warranting finding that the price was marked up to meet discount, and that those purchasing thought they were getting a real discount, though price was maintained in absence of such a check.

In Error to the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

John W. Sprinkle was convicted of violation of the postal laws, and brings error. Affirmed.

William L. Marbury and Eugene O'Dunne, both of Baltimore, Md., for plaintiff in error.

Samuel K. Dennis, U. S. Atty., and James A. Latane, Asst. U. S. Atty., both of Baltimore, Md.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

KNAPP, Circuit Judge. Plaintiff in error, hereinafter called defendant, was convicted with others of using the mails to defraud, in violation of section 215 of the Penal Code. There is little dispute as to what he did; the main question being whether it was enough to

warrant a verdict of guilty. Briefly described, his "plan of business," as he calls it, carried on in the name of the Grand Piano Company, was this: Coming to Baltimore early in 1916, after similar activities in a number of other cities, he secured the outstanding lease of a store for the unexpired term of some six months from February 9th of that year. He then inserted in the local papers a display advertisement of a free contest for ten grand prizes for the best answers to the "Great War Puzzle," which was shown in picture, the answers to be mailed or brought to the store before 10 a. m. of the 1st of March. The listed prizes ranged from a new $400 upright piano to a pair of roller skates. In addition to this there was also promised "to all other persons answering this advertisement" the gift "absolutely free" of a fountain pen, or a gold-plated locket, or a handsome penknife. These gifts, it may here be noted, were of only insignificant value; and the absurd simplicity of the "Puzzle," which any intelligent child could solve, is manifest from the fact that when the "contest" closed on the day named about 32,000 answers had been received. It is admitted by defendant that the sole purpose of this advertisement, with its puzzle and promises, was to obtain the names and addresses of persons to whom he might try to sell pianos, as will now be narrated.

It was evidently Sprinkle's intention, as a jury might well find, to have mailed to each of the 32,000 persons who had answered the advertisement, so far as their names could be deciphered, a sealed envelope containing: (1) A letter; (2) a "purchase check"; (3) a printed folder, and (4) an order for fountain pen, etc. At the time of his arrest on the 21st of March upwards of 23,000 such inclosures had been prepared for mailing and about 13,000 actually mailed. Omitting unimportant parts, the letter reads as follows:

"You have been awarded a purchase check of $125.00 as one of the contestants in our prize puzzle contest. Same is herewith enclosed.

"This check is your order to select any new piano or player piano of Cable & Sons or Clough & Warren make and a credit for $125.00 will be given you on account and the balance may be paid in small monthly payments. Should you decide on any other of the many makes of new pianos we sell, you will be credited on account by $102.50.

"Do not fail to see the beautiful new pianos we are offering for $187.00 during our big introductory sale, which is now going on. This piano is regularly listed by the factory to sell for $250.00, and all it will cost you with this purchase check is $84.50. Do not write, but call at our salesroom at 347 N. Charles street (corner Mulberry street), Baltimore, Maryland, to see this greatest piano offer ever made in the state of Maryland. A discount of 10% will be allowed for cash, and car-fare allowed to out-of-town customers.

"One check only will be accepted from a customer. Do not wait, for unless you advise us within ten days from the date hereof that you will claim this check, it will be canceled and become void.

"All pianos are marked in plain figures at the reduced selling price below the factory list price during the big sale, and it is not necessary to mention having the check until after you have selected the piano you desire to purchase. Store open every evening until 9:00.

"P. S.—This check may be transferred to a friend who wishes to purchase a piano or player, and in event a purchase is made as above stated, it will entitle you to a diamond ring or gold-filled watch. Prize winners' and judges' names and addresses can be seen at our store."

On the reverse side of the letter was a paragraph of comment on the great expense of advertising, paying commissions, and the like in the

ordinary conduct of the piano business, with a declaration in substance that defendant could afford to undersell other dealers because he incurred none of those expenses. To this was added the following statement, the last sentence in heavy type:

"We have a one-price system, and it makes no difference if the purchase check is $25.00 or twice that amount, there is no deviation from the marked prices. The prices of the pianos are exactly the same as listed by the factory, and a child can purchase as safely as the shrewdest buyer. We do not ask you to present your purchase check until you have selected the piano you want, to prove there is no opportunity to advance prices."

The "purchase check" inclosed in the letter was invariably for $125 payable to the order of the person to whom the letter was addressed, and signed, "Grand Piano Company, J. W. Sprinkle, President." In size, shape, and general appearance it closely resembled the bank check in customary use. At the left of the signature, under the line naming the amount, was the date after which it would be void, and beneath this in fine type, the following:

"This check is not redeemable in cash, and can be applied only as part first payment on any new Cable & Sons or Clough & Warren piano or player piano or $102.50 on any other new piano or player piano in our wareroom if presented on or before date of expiration."

The checks were numbered in serial order for record purposes, but they bore different dates of expiration, probably to avoid the presentation of too many of them on the same day.

The "folder" inclosed contained cuts of an upright piano and of a piano player with descriptions of same and statement of prices. The fourth inclosure was an order, good if presented within ten days from date of letter, for one of the trinkets promised to every person who answered the advertisement.

In the store of defendant was an assortment of pianos and player pianos, all of the cheaper, if not cheapest, grades. They were mostly, perhaps all, of the class known as commercial pianos; that is, as we understand, pianos on which the manufacturer would stencil, as requested by the dealer, any name not protected by trademark or copyright as the purported maker of the instrument. Thus two pianos from the same factory, and precisely alike in finish and action, might and frequently were stenciled with the names of different makers, one purporting, for example, to be a "Haynes" and the other a "Wagner." On each instrument in stock was a card or tag showing the maker, number, style, and kind of wood, and also showing a certain "Price," with pen strokes through the figures, and a "Sale Price" of much lower amount written below, the former, for instance, being $450, and the latter, $327. The "Price" indicated was what is known as the "factory list price," a purely arbitrary and meaningless figure having no relation to cost or value and greatly in excess of the sum at which the dealer in nearly all cases would offer to sell the instrument. In a word, the list price is very much above what is expected or even asked except in rare instances. The "Sale Price" written on the tag was the price fixed by Sprinkle for the pianos he had on sale. In conjunction with the higher "list price," which had been partially crossed out, it looked like a reduced or "marked down" price, and

244 F.—8

was doubtless designed to give that impression. On this "Sale Price" so fixed and displayed the defendant accepted "as part first payment" for each instrument sold one of the "purchase checks" above described, taking it for $125 if a Cable & Sons or Clough & Warren was purchased, or for $102.50 if some other make was selected. In all cases, however, some money had to be paid before delivery, namely, $15 on a piano and $25 on a player piano. The balance was payable in monthly installments, and for all cash a discount of 10 per cent. was allowed.

The scheme of defendant thus outlined would not be likely to mislead buyers of experience and wordly wisdom, but it is at once seen to be exceedingly well calculated to deceive the ignorant and gullible. To persons without knowledge of piano values, uninformed and unsuspecting, it would be sure to make an alluring appeal. And so it proved. In the nine days of business before the arrest a total of 119 instruments were sold, or an average of more than 13 a day. The purchasers were mostly nurses, housekeepers, machinists, plumbers, street car conductors, and other wage-earners, white and colored, of similar occupations. These facts speak for themselves, and it is quite unnecessary to enlarge upon the artistic shrewdness of defendant's enterprise. Enough to say that a jury would be amply justified in finding, from the testimony of numerous witnesses, that the instruments sold were represented to be worth the carded "Sale Price," that is, the sum actually paid by the buyer plus the "purchase check" turned in; that the 119 persons who bought, or at least the greater part of them, believed they got a discount from real worth of the amounts for which their purchase checks were accepted, and would not have bought otherwise; that defendant not only intended they should so believe, but knew that the sales in question were effected solely because of that belief, and further knew that such purchase checks were in fact worthless because the money payments made or agreed to be made in each case were fully equal to the prices at which the same instruments could be elsewhere procured. In short, the evidence of record clearly warrants the inference of fraudulent purpose.

Nevertheless it is earnestly contended that defendant's scheme was not unlawful, and therefore the government failed to make out a case. The argument is that no legal fraud was perpetrated by Sprinkle because his "Sale Price" was strictly adhered to in all cases, and no pianos sold except to customers entitled to the credits stated in their purchase checks. In other words, since an instrument could not be bought any cheaper without a purchase check than with one, the checks were not fictitious, but had a credit value precisely as represented for "part first payment" of the fixed and unvarying selling price. The argument is far from convincing. As a practical matter Sprinkle had to make good his assertion in that regard, because belief in the purchasing power of the checks would be destroyed and the whole scheme discredited if it became known that pianos could be bought with all cash for less than the sales prices at which they were offered. And he could well afford to take that position; for the chances of getting those prices in actual money were quite too remote to be taken into account. Moreover, it is not to be said that a dishonest method of doing business can be kept immune from attack by

scrupulously sticking to it under all circumstances. Surely the fact that defendant had but one selling price and invariably exacted that price, whether paid wholly in money or partly with a purchase check, could not serve to prevent the jury from finding that his plan of operations was deceitful and fraudulent.

The kindred contention is made that the scheme in question was not illegal because there is no "actual, usual, and customary retail price" for such pianos as Sprinkle sold, and therefore he could not have planned and intended, as the indictment charges, the arbitrary and designed fixing of his "Sale Price" sufficiently above such usual and customary retail price to cover the credit allowed to the holder of a purchase check, and thus enable him to make the credit allowance and still get for his pianos fully as much money as instruments of the same kind are ordinarily sold for by retail dealers. The sufficient answer to this contention is that in our judgment there was abundant evidence to warrant submission of the question to the jury. This was the decisive issue, as the jury well knew, for they were told by the learned trial judge, and the instruction was emphasized by repetition, that the defendants could not be convicted, "unless you believe that they fixed a price in their own minds which they expected to get, which was their usual and customary price, or one that they sought to get in other places and succeeded in there getting, and added the amount of this fictitious credit check to it for the purpose of taking it off again." That this is what the transaction amounted to seems to us an almost unavoidable conclusion. The price fixed in defendant's mind as the usual and customary price which he aimed and expected to get was the actual amount of money to be paid by the customer, and any pretense that it was otherwise is only an appeal to credulity. It is not difficult to look through this elaborate device for giving the purchase checks an apparent value and see that his obvious object was to sell pianos for the cash that buyers had to pay. That was the real price he realized in practically all cases, on "the overwhelming proportion of the pianos sold," as the trial judge told the jury they might find from the evidence, and it is but reasonable to hold that this price, accepted freely and habitually throughout the course of his extensive dealings in Baltimore and elsewhere, was in fact "the actual, usual, and customary retail price" at which he sold pianos. The arbitrary addition thereto of an amount just equal to the credit allowed to the holders of purchase checks produced the fiction of a "Sale Price," in part payment of which the checks were received, but this inflated figure was in no real or honest sense the actual retail price which defendant sought to obtain. The jury were justified in so finding, and the contention that the government failed to prove the offense charged in the indictment cannot be sustained.

The minor questions raised by the assignments of error are not of sufficient merit to require discussion. They involve no novel or unfamiliar principles, and nothing would be gained by their detailed review. The record discloses no ruling of which the defendant can justly complain, or for which the judgment against him should be set aside.

Affirmed.