## THE BLANDON.

District Court, S. D. New York.
Dec. 16, 1929.

Leo J. Curren, of New York City, for libelant.

Lampke & Stein, of New York City, for respondent.

CAFFEY, District Judge.

I have puzzled a good deal over the only question involved. This is the value of nitrates (in pesetas per 100 kilos) at Valencia, Spain, on June 8 and July 5, 1919. The indefiniteness of much of the proof and the flat contradictions on the material points have caused my uncertainty. I have finally concluded that the nearest approach to a correct result can probably be reached by assigning (as best I can) to each type of evidence the relative weight to which inherently or by law it seems to be entitled.

█ As I conceive the situation, I can indulge no presumption in favor of the report of the commissioner. The evidence (regarding depositions as mere writings) is exclusively documentary. The commissioner saw no witnesses. I am in the same position as he in determining the weight of a particular piece of evidence. Consequently, it is not only within my province but it is my duty to examine all of it and to draw my own conclusion. United States v. Paquete Habana, 189 U. S. 453, 466, 23 S. Ct. 593, 47 L. Ed. 900.

█ Three things should be borne steadily in mind:

(1) The burden is on the libelant.

(2) $1,600, received by the libelant from the bankrupt estate of the charterer, must be credited before there can be a recovery under the interlocutory decree. This (as nearly as I can estimate) requires a decrease of at least 1.3 pesetas (for 100 kilos) in the value of nitrates at Valencia between the relevant dates to create a loss, through fall in prices, sufficient to equal that sum.

(3) In ascertaining market value of an article at a remote time—particularly when the scale between experts is in balance and credibility cannot be tested by observation of or listening to those who testify— the most reliable, as well as the most persuasive, evidence (better than anybody's opinion) is actual sales on or about the designated date. The Albert Dumois, 177 U. S. 240, 255, 20 S. Ct. 595, 44 L. Ed. 751. See also The Alcazar (D. C.) 227 F. 633, 662.

The controversy is chiefly between two groups of witnesses. On the one side, two (Pla and Cortes) say that the value on June 8 was 75 and on July 5 was 65. (Burgoyne will be separately mentioned hereafter.) On the other hand, one (Barrera) says that the range for the same period was from 67 to 68, and another (Carsi), that the value on both dates was the same. The drop of 10 pesetas (as claimed by Pla and Cortes) was adopted by the commissioner. If what the other witnesses said be correct, it would follow that libelant suffered no injury.

The conflict is irreconcilable. It cannot be composed by compromise or adjusted by averages. Hence it is essential to make an unequivocal choice. How to do that is the problem.

The whole evidence consists of depositions by five dealers at Valencia (Pla, Cortes, Burgoyne, Barrera, and Carsi), a trade journal at Valencia (published by Albuquerque), and a certificate issued by the Valencia Chamber of Commerce (referred to by the parties as Exhibits A and B). So far as concerns the dealers, I discover nothing in their experiences or personalities entitling one to rank above another. They appear to be experts of about equal qualifications. They should be treated as on the same plane, making due allowance for possible bias of any witness toward the party by whom he is called.

█ All the witnesses testified long after the dates with which we are concerned—from

about 6 to 9 years later. It is manifest that what they said is practically worthless unless based on or corroborated by writings current with the transactions. Memory is too frail for it to be otherwise. If my statement be disputed, then surely at least it will be conceded that testimony substantiated by contemporary records, compiled in the regular course of business, is to be preferred over and is more reliable than that which rests only either on opinion or on recollection, however competent or reputable the witnesses may be. See, for example, the view of Mr. Justice Story in Hough v. Richardson, 12 Fed. Cas. 566, 578, second column, No. 6722.

From the standpoint of weight, by reason of nature of what was said or by reason of corroboration, the witnesses fall into three classes: (1) Barrera and Carsi, who produced and put in evidence records of their own sales made on or about the relevant dates; (2) Cortes and Albuquerque, who testified from records made by themselves on or about the dates involved of information then gathered by them in regard to sales by others; (3) Pla, Cortes, and Burgoyne, who expressed opinions and made statements, without (so far as appears) resorting (except to the extent later explained) to any memoranda whatever of contemporaneous sales either by themselves or by others. The substance of the proof will be stated in the order of merit as just recited; the testimony of Cortes, as will be observed, being dealt with twice.

Taking up first those who relied on and put in evidence their own records of sales made by themselves, with volume and (except by one witness) name of purchaser in each instance:

Barrera says that in June, 1919, preceding the 8th, he made single sales on the 2d at 69 and on the 6th at 67, and after the 8th, on the 17th, 18th, and 20th seven sales at prices ranging from 66 to 69. With respect to July, he gives no sale immediately preceding the 5th; on July 5, he made a sale at 68; thereafter he made five sales each day on the 7th at from 67 to 70, on the 8th at from 65½ to 70, and on the 9th at 67 to 70, and two sales on the 10th at 69 and 71.

Barrera estimates the value as 67 on June 8 and 68 on July 5. His own records of his own sales fully sustain him. He was thoroughly justified by them in saying that there was a slight increase in value on July 5 over the value on June 8.

Carsi shows that in June he made one sale on the 3d at 69 and two sales on the 5th at 70; on the 18th (the nearest date of a sale by him after June 8) he made one sale at 66, and on each four later days at from 68 to 70. In July all sales by himself on or about the 5th were at 70—one each on the 3d, 4th, and 7th and two on the 5th. He seems therefore warranted, and his own records substantiate him, in saying that he estimated values on June 8 and July 5 at 70 and that there was no fall in price between the two dates.

Turning next to the witnesses basing their testimony upon contemporary memoranda of information gathered by themselves as to sales made by others:

Cortes from his record gives no sale by himself in June earlier than the 24th or in July later than the 4th. During July he made two sales on the 3d at 64 and two on the 4th, one at 64 and the other at 65. These prices are lower than those given by either Barrera or Carsi from their own experience on dates near July 5. Cortes also furnished, apparently from his sales book, what he denominated prevailing prices for June 8 and July 5; but plainly those were based solely on information derived from others.

While the testimony just mentioned is competent, the significance to be attached to it, in the effort to appraise it in conjunction with all the other testimony, is perhaps lessened by the facts that (a) customarily Cortes dealt in larger single lots than the other witnesses; (b) he does not supply data from which one may determine, in the way he recorded his individual transactions, whether there was a range upward or downward between June 8 and July 5; (c) other than in his own business, he does not state whether so-called prevailing prices were based on actual sales; and (d) without more details about the information in his book which came from outsiders, confident inferences cannot be drawn, with regard to whether a rise or fall of prices was in progress between June 8 and July 5, by comparison of his sales with those of others.

Notwithstanding all that has been said, the deposition of Cortes is impressive. I have studied it carefully. But for the direct contradiction by the ship's witnesses, I should be inclined to accept his estimate. It is to be remembered, however, that the real concern is to find whether by July 5 there was an increase or decrease in the value of June 8. It is not of consequence what prices were on the two dates, save only that knowledge of them may help us to define the extent and nature of the change. Due to the

defects, for that purpose, in the statement, pointed out above, it seems to me impossible to say that, when analyzed, it affords satisfactory corroboration, from contemporary documentary sources, of a fall in value; much less to say that it requires rejection of proof to the contrary that is based wholly on contemporary documents.

■ The trade journal (Los Mercados) was published weekly at Valencia. It had a circulation in 1919 of about 1,000. The subscribers were engaged in agriculture or businesses allied to agriculture. The proprietor, Albuquerque, gathered from local dealers their quotations and then at the end of each week published the average of the actual market prices which had been reported to him (usually for the day of publication) by these dealers. The issue of June 7 gave the average price as 66 to 70, and the issue of July 5, as 70. In other words, this journal substantiates the conclusion of Barrera and Carsi, from the records they kept of their own sales, that there was no fall in prices between June 8 and July 5.

Libelant objects to this newspaper evidence; but I think that, within the rule laid down in Virginia v. West Virginia, 238 U. S. 202, 212, 35 S. Ct. 795, 59 L. Ed. 1272, and Whelan v. Lynch, 60 N. Y. 469, 474, 19 Am. Rep. 202, it was admissible.

Considering lastly what was said by Pla, Cortes (save as previously covered), and Burgoyne:

While Pla asserted that he knew the values on June 8 and July 5 and that sales were made on those particular dates at the prices given by him, yet it does not appear that his deposition was based on any contemporary document. Seemingly also he had not consulted his books and he was unable to tell whether he had participated in any sale on or about either date.

Cortes expresses the same opinion as Pla as to what values were on both dates. I have already set out the grounds on which I appraise the evidence of Cortes as insufficient to overcome the valuations adopted by other experts which, because based on contemporary records, I feel impelled to prefer.

While Burgoyne kept a sales register, he did not produce it or testify from it. He says expressly that he made no sale on either date. At first he declined to furnish a price for June 8. He fixed the value on July 5 as 64 and subsequently that for June 8 as 77. He distinctly disclaimed, however, having any actual knowledge on the subject. The figures he gave confessedly were derived entirely from local merchants; when or how is not shown.

Libelant urges that the probabilities are that there was a drop in prices between June 8 and July 5. The principal users of nitrates at or in the region of Valencia are farmers. It is said that by May 31 their crop is planted and purchase by them of nitrates as fertilizers ends for the season. It is argued therefore that it would be natural to expect a decline thereafter in prices. The contention, however, is not sustained by the evidence. It is true that two witnesses (Pla and Burgoyne) testified, in effect, that demand for fertilizers ceased in May; but three witnesses (Cortes, Barrera, and Carsi), one of whom testified in behalf of the libelant, emphatically stated that the demand continued actively through July. Moreover, a portion (though perhaps only a small share) of the nitrates imported at Valencia go into the manufacture of chemicals, and we are not informed that this is seasonal or of the extent to which it influences prices.

■ The tenth exception complains of the commissioner admitting in evidence Exhibits A and B (the Valencia Chamber of Commerce certificate). Although originally the certificate was clearly incompetent, it will be assumed, and seems true, that it was rendered competent by the ship using it. The certificate, however, is of no real consequence. It contains only extracts from three letters to the chamber, dated in 1922. Two were from persons (Pla and Burgoyne) who thereafter testified. Concerning the writer of the third (Garcia) we know nothing, and he fails to tell us where or when he got the facts or whether he was merely repeating hearsay. I think therefore that little attention need be paid to what he says.

■ In the charterer's bankruptcy proceeding (Exhibit D) a claim was filed by the libelant, based on the identical matter now under consideration, and was allowed at $10,000. Here, however, what transpired in the bankruptcy proceeding is of no probative force, much less is it res adjudicata. The issues in the two cases were different. The controversy in bankruptcy was not with the ship. See In re Triangle S. S. Co., Inc. (C. C. A.) 3 F.(2d) 894. The present controversy is with the ship. The interlocutory decree entitles the libelant to recover from "the said Steamship Blandon and her stipulator." Moreover, it provides, as a measure of damages, "the difference in market value at Valencia, Spain, of said cargo between June 8, 1919, and July 5, 1919." What occurred in

the bankruptcy proceeding, if competent, would not assist in determining market values on the two dates specified.

I conclude therefore that the libelant has failed to establish any fall in value by July 5 from that which prevailed on June 8; much less has it been shown that there was a fall sufficient to absorb the bankruptcy dividend.

Exceptions first to seventh, ninth, and eleventh to commissioner's report sustained; other exceptions overruled.