### UNITED STATES of America, Appellee,

### v.

### Roy M. BLOOM, Philip Polishook, Roy M. Bloom, Inc. and K. Polishook & Son Corp., Defendants-Appellants.

### No. 343, Docket 24040.

United States Court of Appeals
Second Circuit.

Argued May 15, 1956.

Decided Sept. 11, 1956.

---

11. See Int.Rev.Code of 1954, Sec. 562, 26 U.S.C.A. § 562, for the legislative answer to this problem.

Goldstein, Judd & Gurfein, New York City (Murray I. Gurfein, Orrin G. Judd, Robert J. Haft, New York City, of counsel), for Philip Polishook and K. Polishook & Son Corp.

Henry G. Singer, Brooklyn, N. Y. (Harry Silver, New York City, on the brief), for Roy M. Bloom and Roy M. Bloom, Inc.

Leonard P. Moore, U. S. Atty., E. D. New York, Brooklyn, N. Y. (Howard B. Gliedman, Frances T. Wolff, Morton J. Schlossberg, Asst. U. S. Attys., Brooklyn, N. Y., of counsel), for appellee.

Before MEDINA, LUMBARD and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

This is an appeal from convictions for using the mails to defraud. Count I of the four count indictment charged Roy M. Bloom, Roy M. Bloom, Inc., Philip Polishook, and K. Polishook & Son Corp. with conspiring in violation of 18 U.S.C. § 371 with Murray Kraut (named as a co-conspirator but not indicted) to engage by use of the mails in a fraudulent "count the diamonds" prize winning contest, entitled "Diamond Puzzle." Counts II, III, and IV charged Bloom individually with causing the "contest" circulars to be mailed to three specific addresses in violation of 18 U. S.C. § 1341. All defendants were convicted on Count I; and Bloom was convicted on Counts II, III, and IV, in which he was the sole defendant. The individual defendants were sentenced to imprisonment for a period of 18 months, and the corporate defendants were each fined $7,500.[1]

Bloom was engaged in the business of direct mail selling of merchandise for various manufacturers; Polishook was engaged in the manufacture and sale of diamond rings and other jewelry. In 1954, having learned of the existence and success of various diamond promotion schemes, Polishook and Bloom, taking certain features from other plans and adding some original ideas, devised their own promotion. Bloom was to benefit by the sale to retail credit jewelers of the materials used in the plan, while Polishook was to profit by the sale of

---

1. For purposes of this appeal, the individual defendants and their corporations will be referred to by their respective individual names, Bloom and Polishook.

special trays of diamond jewelry designed to accompany the promotion. Defendants concede that they devised the plan, wrote the circulars, letters, and other materials used in the promotion, and sold the scheme to Murray Kraut, the co-conspirator mentioned in the indictment, who was a retail credit jeweler in New York City doing business as Post Jewelers. It is also conceded that the specific mailings mentioned in the indictment were made pursuant to the sale of the diamond promotion scheme to Kraut. Thus the only issue in the case was whether the plan was a fraudulent scheme under 18 U.S.C. § 1341.

The salient features of the diamond promotion scheme devised by Bloom and Polishook were as follows: Retail credit jewelers purchasing the promotion were supplied with circulars to be mailed to their customers and others in their area inviting their participation in a "diamond counting contest." All the contestant was asked to do was to count the diamonds appearing in pictures of jewelry in the circular, jot down the total count arrived at and his name and address on an attached reply card, and place the reply card in the mail. The circular offered diamond rings of specified values as 1st, 2d and 3d prizes. The promise to award, and the actual awarding of, these prizes is not involved in this prosecution. In addition to the first three prizes, contestants were to be awarded "merit prizes" consisting of "diamonds valued at $50." The circular stated that there were "no strings of any kind," that there was "absolutely no merchandise to buy," and that the purpose of the contest was "to promote the love and appreciation of precious diamonds."

The merit prizes of diamonds valued at $50 were the crux of both the promotion and the prosecution. Although the scheme purported to be a "contest," actually everyone who participated (except the first three winners) was intended to receive and did receive a congratulatory letter informing him that he was "one of a group who has won a fourth prize in our 'Count-the-Diamonds' Contest. The award is a beautiful $50 diamond." The award diamond, represented to have a value of $50, was to be a four or five point cut diamond (four or five one-hundredths of a carat), which Polishook offered and sold to the retailers at a wholesale price of $4 per diamond. The letters specified a date on which the "contestant" could receive his prize award and informed the contestant that a photographer would be at the store at that time to photograph the presentation.

The aim of the promotion, outlined in detail in an elaborate set of instructions provided store personnel as part of the sale of the promotion scheme and materials, was to transform these contestants into customers when they showed up to claim their merit award diamond. This purpose could perhaps be inferred by a careful reader from the contest circular and congratulatory letter, both of which plainly stated that no loose diamonds were to be handed out: "This brilliant diamond must be set in a setting of your choice, or in any jewelry you may own in gold or platinum. A small charge for the labor involved."[2] Clearly, the "winner" would be required at the very least to purchase a setting or bring one of his own.

The hoped-for transformation from contestant to customer was planned in the following manner: When the contestant entered the store he was to be enthusiastically greeted by a salesman, congratulated for winning a $50 diamond, and ushered into a rear room to have his photograph taken. Then the contestant was to be asked whether he had brought a gold or platinum setting with him. Ordinarily the answer would

2. Quoted from one of the fourth prize award notification letters. The circular stated a reason for the requirement that the award diamonds be set in a ring: "The Merit Prizes of diamonds must be set in any object of solid gold or platinum at a slight labor cost. This is merely to protect the diamonds from being lost and to insure that they are worn by the winners."

be "No," and the salesman would then show the contestant diamond rings, priced at $79.50, in which "the diamond he had won" or a "similar diamond" was mounted. These rings were to contain a four or five point diamond, and were to be obtained from the defendants at a wholesale price of $14 per ring[3] or from other suppliers. The contestant was then informed that his merit prize entitled him to a $50 credit on this ring, or on any other higher priced diamond merchandise in the store. In order to prevent the use of this credit on low-priced diamond merchandise, the retailer was to display only rings and jewelry priced at $79.50 or more.

While it was hoped that all "contestants" would purchase rings priced at $79.50 or more, the instructions envisioned two other possibilities and detailed the manner in which these other situations should be handled. If a person brought his own mounting, and could not be persuaded to trade it in for an additional credit on a new ring, the jeweler was to set a loose four-point diamond in the mounting for a charge of $6. If a person insisted upon obtaining the merit prize diamond in a loose form —contrary to the requirement, stated in the contest circular and congratulatory letter, that the diamond be set in a mounting—the retailer was to avoid trouble by giving this contestant a loose diamond.

Each customer who purchased a ring was also to receive a "Trade-In Certificate" from the retailer entitling the customer to return the ring at any time in the future and receive a credit in the amount of its full marked price against any higher priced merchandise. For example, a customer purchasing for $29.50 a ring priced at $79.50 was to receive a trade-in certificate for $79.50. Similarly, a person supplying his own mounting was to receive a $50 credit for the future purchase of any higher priced merchandise.

The Government evidence established, and defendants concede, that this promotion scheme was carried out by Kraut, the retail credit jeweler named as co-conspirator in the indictment, in accordance with defendants' plan and instructions. Government witnesses testified that they returned reply cards to Kraut's jewelry store with both accurate and arbitrary diamond counts; that they received letters congratulating them on winning merit prizes of $50 diamonds; that they went to Kraut's jewelry store where they were shown $79.50 diamond rings in which "their diamond" or a "similar one" had been mounted; and that they paid $29.50 for such rings, also receiving a trade-in certificate in the amount of $79.50. One Government witness brought an old mounting to Kraut's store; a loose four point diamond was set in this mounting at a cost of $9.75. None of the Government witnesses asked for, nor were they given, loose diamonds.

The alleged errors raised by this appeal fall into three categories: (1) whether the evidence of fraud was sufficient to justify the court's denial of a motion for a directed verdict of acquittal, and to sustain the conviction; (2) whether defendants were unfairly restricted on the issue of value by alleged errors in the admission and exclusion of evidence, and whether the charge to the jury on this issue was prejudicial; and (3) whether defendants were prejudiced with respect to their defense that they were acting in good faith by alleged errors in the exclusion of evidence and in the charge.

■ We think that the evidence was sufficient to support the court's denial of a motion for acquittal and to require the submission of the case to the jury. Although the convictions necessarily rested on opinion evidence of value and inferences of fraudulent intent, there was ample evidence to go to the jury and from which the jury could conclude beyond a reasonable doubt that defendants had

---

3. In addition, the Government proved one sale of such rings to Kraut at a wholesale price of $11.57 per ring.

162

knowingly and fraudulently misrepresented the value of the "$50 diamonds" and the "$79.50 diamond rings." Defendants argue that the promotion scheme cannot be considered fraudulent because the diamonds were being given away for nothing, because the purchasers of the diamond rings received value for their money, and because the merit prizewinners did not suffer any loss. However, by its terms 18 U.S.C. § 1341 applies even when the article is "given away," and the applicable decisions clearly state that monetary loss is not necessary to make the scheme fraudulent. United States v. Rowe, 2 Cir., 1932, 56 F.2d 747, certiorari denied 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289; Wine v. United States, 8 Cir., 1919, 260 F. 911, 914, certiorari denied 253 U.S. 484, 40 S.Ct. 481, 64 L.Ed. 1024; Linn v. United States, 7 Cir., 1916, 234 F. 543. If the diamonds which the defendants purported to give away did not have a value of $50, and the defendants knowingly misrepresented their value, 18 U.S.C. § 1341 was violated because the expectations aroused by the false promise of value were not fulfilled. See Durland v. United States, 1896, 161 U.S. 306, 313, 16 S.Ct. 508, 40 L.Ed. 709; United States v. New South Farm & Home Co., 1916, 241 U.S. 64, 71, 36 S.Ct. 505, 60 L.Ed. 890; Harris v. Rosenberger, 8 Cir., 1906, 145 F. 449, 458, certiorari denied 203 U.S. 591, 27 S.Ct. 778, 51 L.Ed. 331; Sprinkle v. United States, 4 Cir., 1917, 244 F. 111; Rude v. United States, 10 Cir., 1935, 74 F.2d 673; United States v. Rowe, supra; United States v. Whitmore, D.C.S.D.Cal. 1951, 97 F.Supp. 733. Nevertheless, we think the convictions must be reversed because of a series of comments and rulings by the trial judge relative to the crucial issue of value, which unduly restricted and limited the defendants in the presentation of their defense.

Value of a salable article, as Wigmore says, "is nothing more than the nature and quality of the article as measured by the money which others show themselves willing to lay out in purchasing it." 2 Wigmore, Evidence § 463 at p. 503 (3d ed. 1940). And see 3 Wigmore, Evidence § 717 at pp. 49–50; Muser v. Magone, 1894, 155 U.S. 240, 249, 15 S.Ct. 77, 39 L.Ed. 135. Both the government and the defendants sought to establish their respective contentions as to value through expert witnesses. The government's expert witnesses testified that there was a standard retail markup ranging from double to three times the wholesale cost. Applying this markup to the substantially undisputed wholesale cost of $4 each for the $50 diamonds results in a retail value for them of from $8 to $12. Similarly the wholesale cost of the $79.50 rings was from $11.57 to $14, and thus the retail value of them would range from $23 to $42. The experts for the defendants, on the other hand, testified that markups were not standardized and ranged from double to twelve times the wholesale cost. Some of defendants' experts also testified that in the relevant market (here agreed to be retail credit jewelers in metropolitan New York) the contest diamonds introduced in evidence by the government had a maximum retail value of $65 or $70, while the rings would sell for up to $100 or $125.

To corroborate the testimony of their experts, but also as independent proof of their contentions as to value the defense sought to introduce testimony as to prices paid in three specific sales. This evidence was originally proffered early in the defendants' case. Since it had not been preceded by an offer of proof of comparability, it could at that time have been properly excluded. Kerr v. South Park Com'rs, 1885, 117 U.S. 379, 6 S.Ct. 801, 29 L.Ed. 924; International Paper Co. v. United States, 5 Cir., 1955, 227 F.2d 201; Schradsky v. Stimson, 8 Cir., 1896, 76 F. 730; see 2 Wigmore, Evidence § 463 at 505 (3d ed. 1940). This, however, was not the ground of the exclusion, for very shortly thereafter the court also sustained objections to questions designed to elicit proof of comparability. Moreover, a colloquy at the bench makes it clear that the court's ruling excluding evidence of the specific sales was based largely on the

view that the only permissible means of proving value was "to bring in someone who is familiar with market value of the product," *i. e.*, by expert testimony.

The overwhelming weight of authority permits evidence of bona fide sales of comparable property under comparable conditions to be admitted in the federal courts as tending to show the value of the property in issue.[4] See 2 Wigmore on Evidence § 463 (3d ed. 1940); McCormick on Evidence § 166 (1954) and authorities there collected in note 1 at p. 348; e. g., Stanton v. Embrey, 1876, 93 U.S. 548, 557, 23 L.Ed. 983 (professional services); United States v. Ham, 8 Cir., 1951, 187 F.2d 265, 270 (land); National Bulk Carriers, Inc., v. United States, 3 Cir., 1948, 169 F.2d 943 (vessels); United States v. Grayson, 2 Cir., 1948, 166 F.2d 863, 869–870 (oil royalties); Washington Home for Incurables v. Hazen, 1934, 63 App. D.C. 185, 70 F.2d 847 (land); The Blandon, D.C.S.D.N.Y., 39 F.2d 933, affirmed, 2 Cir., 1930, 42 F.2d 1013 (nitrates); Moran v. Lucas, 1929, 59 App.D.C. 142, 36 F.2d 546 (corporate stock). And also see Standard Oil Co. of New Jersey v. Southern Pacific Co., 1925, 268 U.S. 146, at page 155, 45 S.Ct. 465, 69 L.Ed. 890; De La Rama S. S. Co., Inc., v. United States, 2 Cir., 1953, 206 F.2d 651, 654–658. The good sense underlying this rule is highlighted by the conflict of expert opinion in this case—an all too typical situation whenever both sides resort to experts. While such a conflict poses a question of credibility which, however difficult, is for the jury to resolve, evidence of actual sales may well be a better touchstone to the truth. Cf. The Blandon, supra.

The government apparently contends that the circumstances of the transactions in question are such as to make inapplicable the general rule of the admissibility of evidence of specific sales, stressing particularly that the rings were purchased by defendants for use on the trial; that one of the rings had been intended to be sold with another, as a set, and the attached price tag carried only the price for the set; that the sellers were in an area known for exorbitantly high prices; and that the buyers practically invited the sellers to make victims of them. We disagree with the government's claims, especially since the defendants, following a suggestion of the district judge, subpoenaed the sellers to appear as witnesses. The government could have brought out on cross examination of the sellers, and also of the buyers who took the stand, any circumstances which it thought might influence the jury to discredit the defendants' witnesses and to accept the testimony of the prosecution witnesses.

Eventually, however, the government "waived" its objection, and the evidence of the other sales was admitted. And, belated though it surely was, we would agree that the admission cured the error were it not for the accompanying comments of the court, which amounted to an instruction to the jury that the probative force of this proof was so slight as to be negligible.

We recognize that the well established rule is that federal judges always may, and sometimes should, comment on the facts. Quercia v. United States, 1933, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321; Simmons v. United States, 1891, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968; and see 9 Wigmore, Evidence § 2551 (3d ed. 1940). Indeed we strongly approve this rule which enables the trial judge to assist the jury in arriving at an intelligent verdict and which has done much to enhance the reputation of the federal courts. See 9 Wigmore, supra. But it is equally well established that the ultimate resolution of questions of fact must be unmistakably left to the jury. Hickory

---

4. State courts take a similar view. See Bagdasarian v. Gragnon, 1948, 31 Cal.2d 744, 755, 192 P.2d 935, 942, and cases cited therein; Goralnik Hat Co. v. Delohery Hat Co., 1923, 98 Conn. 560, 120 A. 283 (hats); Harlan & Hollingsworth Corp. v. McBride, 1949, 6 Terry 85, 45 Del. 85, 95, 69 A.2d 9, 14 (machine tools); Carr v. Moore, 1860, 41 N.H. 131 (horse).

v. United States, 1896, 160 U.S. 408, 421–423, 16 S.Ct. 327, 40 L.Ed. 474; see United States v. Curzio, 3 Cir., 1948, 170 F.2d 354, cf. Quercia v. United States, 1933, 289 U.S. 466, 53 S.Ct. 698, 77 L. Ed. 1321, reversing 1 Cir., 62 F.2d 746.

The comments in question were touched off by the objections of the United States Attorney that there had been no testimony as to the wholesale cost of the jewelry involved in the specific sales, and that the sales prices were not, therefore, evidence as to proper markup. The court agreed that "that is a weakness"; stated, "It seems to me that this [the sales price] has very little bearing upon the principal issue here, and that is the number of times of markup"; and, although overruling the objection stated to the jury, "but I wish to point out to you that it [the sale price] has little bearing on relevancy." With respect to the sale price of a second ring, the court stated that "it has little bearing, but the jury may consider it for what it is worth." Still another time, in response to a similar objection by the government, the court stated, "Same ruling, that the jury will take them for what they are worth, that they have very little bearing on the issue here, which is the question of markup over cost."

Had the court been correct in its formulation of the issue as "markup over cost," its comments would doubtless have been at most harmless error, for it is difficult to conceive how any reasonable person could suppose that the sale price of an article constituted proof of the markup commonly used in the trade. Despite the volume of testimony on the point, however, markup was never more than a subsidiary issue: if the existence of a standard markup had been established to the satisfaction of the jury, as on the evidence it could have been and apparently was, then it was one permissible way of establishing value, the primary issue, as the court itself in its formal charge instructed the jury. Or, had the court qualified its evaluation of defendants' evidence so as to show that it was intended only as an expression of opinion, rather than as a ruling binding on the jury, then the comment might well be disregarded. But the issue was value, the markup over cost was incidental, and notwithstanding the standard formal instruction as to the functions of judge and jury, the jury must, we think, have understood the court's remarks quoted above as directions or rulings, rather than mere comments.

The defendants have advanced many other claims of error, but it is unnecessary to discuss them. Some are without merit, others may not rise again.

Reversed and remanded.